SANTA MONICA BAYKEEPER,
a non-profit corporation,
Plaintiff,

v.

KRAMER METALS, INC., a corporation; Spectrum Alloys, Inc., a corporation; Continental Truck and Towing Company LLC, a limited liability company; R & P Renovators, LLC, a limited liability company; Kramer/Spirtas, LLC, a limited liability company; Rail Prop, LLC, a limited liability company, Defendants.

Case No. 07–03849 DDP (FMOx).

United States District Court,
C.D. California.

Feb. 27, 2009.

Daniel Cooper, Martin McCarthy, San Francisco, CA, Andrew L. Packard, Michael P. Lynes, Andrew L. Packard, Law Offices of Andrew L. Packard, Petaluma, CA, for Clean Water, Inc.

Emily Julia Atherton, Jason M. Booth, Dongell Lawrence Finney, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DEAN D. PREGERSON, District Judge.

Santa Monica Baykeeper ("Baykeeper") brings this action to enforce alleged violations of the Clean Water Act. Defendant Kramer Metals ("Kramer") has owned and operated two scrap metal recycling plants in Los Angeles. Baykeeper moves for Partial Summary Judgment, seeking a finding of liability for a total of 14,092 violations and days of violation against Kramer. After reviewing the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the Motion for Partial Summary Judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Kramer Metals is the current and/or former owner and operator of two scrap metal facilities located in Los Angeles that are the subject of this lawsuit. It is undisputed that storm water discharged from both facilities is regulated by California's Industrial Storm Water Permit ("General

Permit"). Pl.'s Request for Judicial Notice ("RJN"), Ex. A (General Permit No. CAS000001, "Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities," Water Quality Order No. 97–03–DWQ).

### A. Kramer 1760

Kramer owns and operates the scrap metal facility located at 1760 Slauson Avenue in Los Angeles, California ("Kramer 1760"). Kramer 1760 sits on approximately 1.8 acres, and includes a yard, office, scale, and operations buildings and equipment. Its operations include scrap metal recycling and processing, as well as vehicle fueling and maintenance. Some of its scrap metal processing and storage occurs outdoors, and the facilities are only partially covered. Storm water coming into contact with the Kramer 1760 facilities discharges from the site via two driveways facing Slauson Avenue and one driveway facing Holmes Avenue. It flows into gutters on Slauson and Holmes Avenues and into a drop inlet on Randolf Street. The drop inlet on Randolph street discharges into Compton Creek, the Los Angeles River, and San Pedro Bay.

Kramer Metals collected samples of storm water discharging from Kramer 1760 at sample location Kramer Outfalls 1 and 2 on April 20, 2007. Cooper Decl., Ex. I at 160. Additionally, as part of its investigation into Kramer's compliance with the Clean Water Act, Baykeeper collected samples on February 11, 2007, February 22, 2007, April 20, 2007, November 30, 2007, January 6, 2008, and November 26, 2008.[1]

### B. Kramer 1000

Until 2008, Kramer also owned and operated the scrap metal facility at 1000 Slauson Avenue in Los Angeles, California ("Kramer 1000").[2] That facility is an approximately 3.5-acre scrap metal facility. Activities include sorting, baling of ferrous and non-ferrous metals, car body smashing, and vehicle fueling. Scrap is stored and processed outside, and the facility is at least partially unpaved. Storm water coming into contact with the Kramer 1000 facility discharges via the driveway facing Slauson Avenue and flows into gutters located on Slauson Avenue, which discharge into Compton Creek, the Los Angeles River, and San Pedro Bay.

Baykeeper collected samples of storm water discharging from Kramer 1000 locations on February 11, 2007, February 22, 2007, November 30, 2007, and January 6, 2008. See Note 1, supra; Defs.' Statement, ¶¶ 182–88.

### C. Procedural History

Baykeeper, a non-profit public benefit corporation organized under California state law, seeks to protect and enhance Los Angeles area waters for the benefit of ecosystems, for the use and enjoyment of its members, and for the public at large. Ford Decl. ¶¶ 4–5. After conducting an investigation of the Kramer facilities at issue here, Baykeeper concluded that

---

1. As discussed in more detail below, Kramer disputes the authority of these samples and what they show. See Defs.' Statement of Genuine Issues ("Defs.' Statement"), ¶¶ 40–50.

2. Operations at that facility stopped in 2008. It is undisputed that on June 17, 2008, Kramer Metals filed a Notice of Termination for the Kramer 1000 facility. According to Douglas

Kramer's deposition testimony, operations at the facility ended in early 2008 because the facility was subject to an eminent domain proceeding in the City of Los Angeles. Atherton Decl., Ex. B at 21:4–11. Baykeeper seeks liability for violations at Kramer 1000 from April 14, 2002 through June 16, 2008. Mot. at 3:8–10.

Kramer 1760 and Kramer 1000 were operating in violation of the General Permit and the Clean Water Act. Baykeeper mailed statutorily required notice of intent to sue on March 10, 2007. On June 13, 2007, Baykeeper filed this suit. Baykeeper's Complaint alleges Six Causes of Action for discharges of contaminated storm water and failure to comply with the requirements of California's General Industrial Permit, in violation of the Clean Water Act. Baykeeper filed this Motion for Partial Summary Judgment on December 12, 2008.

## II. BAYKEEPER'S MOTION FOR SUMMARY JUDGMENT

Baykeeper moves for a finding that each Kramer facility violated the Clean Water Act in five ways. At bottom, Kramer's opposition to summary judgment takes two approaches. First, Kramer argues that certain EPA-promulgated standards do not have the legal impact Baykeeper accords them. Second, and more broadly, Kramer argues that genuine issues of material fact pervade this suit and make summary judgment inappropriate on all grounds.[3]

### A. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; and material facts are those

"that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

"As the party with the burden of persuasion at trial, [Baykeeper] must establish beyond controversy every essential element of its" Clean Water Act claim. *So. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir.2003)(citing William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127 (2001)). All reasonable inferences from the evidence must be drawn in favor of Kramer. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Kramer can defeat summary judgment "by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor." *So. Cal. Gas Co.,* 336 F.3d at 888. As the party opposing summary judgment, Kramer must come forward with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed.R.Civ.P. 56(e); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995).

### B. *Legal Framework: The Clean Water Act and California's General Permit*

#### 1. *The Clean Water Act and Permit System*

The objective of the Clean Water Act is to restore and maintain the "chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). In accordance with that objective, § 301(a) of the Clean Water Act makes unlawful "the discharge of any pollutant by any person,"[4] unless in compliance with a permit

---

**3.** Although Kramer lists some of these genuine issues in its Opposition, it makes this argument primarily by pointing to its Statement of Genuine Issues of Material Fact and

the declarations supporting the Opposition. Opp. at 17:7–14.

**4.** As a corporation, Kramer is a "person" under the Clean Water Act. 33 U.S.C.

issued under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §§ 1311(a), 1342; *Envtl. Prot. Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). "An NPDES permit serves to transform generally applicable effluent limits and other standards . . . into the obligations . . . of the individual discharger." *State Water Resources Control Board*, 426 U.S. at 205, 96 S.Ct. 2022.

Noncompliance with a permit constitutes a violation of the Clean Water Act. 40 C.F.R. § 122.41. Authority to issue permits under the NPDES is vested in the Administrator of the Environmental Protection Agency, but that authority may be delegated to states. 33 U.S.C. § 1342(b); *Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F.Supp. 1368 (D.Haw.1993). The State of California has been granted permitting authority.

The Clean Water Act authorizes citizen suits "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." [5] 33 U.S.C. § 1365(a)(1). The Act imposes strict liability for NPDES violations. *See Hawaii's Thousand Friends*, 821 F.Supp. at 1392 (noting that because the Clean Water Act imposes strict liability, issues of fault do "not absolve the violator from penalties, although [a lack of fault] might mitigate the amount of the penalties assessed"). Accordingly, to establish a violation of the Act, Baykeeper need only prove that Kramer violated the terms and conditions of its NPDES permit. *Id.*

### 2. *California's General Storm Water Permit*

Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), establishes a framework for regulating pollutants associated with industrial activity. Pursuant to EPA regulations, authorized states may issue general permits or individual permits to regulate storm water discharges. *See* 40 C.F.R. §§ 122.26(c), 122.28, 123.25; *see also* 60 Fed.Reg. 50804–01. California has issued a General Permit that applies to all storm water discharges requiring a permit except construction activity.[6] RJN, Ex. A. The parties agree that the General Permit governs Kramer's facilities.

The General Permit implements the requirements of the Clean Water Act through both technology-based provisions and water quality-based standards. As relevant here, the General Permit sets out four basic requirements for permittees: (1) effluent limitations, (2) receiving water limitations, (3) the implementation of a Storm Water Pollution Prevent Plan, and (4) the development of a Monitoring and Reporting Program.

First, the General Permit sets effluent limitations. There are three basic effluent limitations. Where the EPA has set effluent limitation guidelines for an industry, storm water discharges may not exceed the specific guidelines. Gen. Permit, Effluent Limitation B(1) (RJN, Ex. A at 22–23). Additionally, storm water discharges shall not contain a hazardous substance equal to or in excess of a reportable quantity listed in 40 C.F.R. Part 117 and/or 40 C.F.R. Part 302. Gen. Permit, Effluent Limitation B(2) (RJN, Ex. A at 23). Nei-

---

§ 1362(5).

**5.** For the purposes of § 1365, the term "effluent standard or limitation under this chapter" includes an unlawful act under § 1311(a), i.e., the discharge of a pollutant in

violation of the General Permit. 33 U.S.C. § 1365(f); *see id.* §§ 1311(a), 1342(p).

**6.** The General Permit was issued in 1991, modified in 1992, and reissued in 1997.

ther of these first two limitations is at issue here: the EPA has not established specific guidelines for scrap metal recycling facilities and Baykeeper does not argue that Kramer's storm water discharges were in excess of a reportable quantity. Finally, the General Permit includes a technology-based requirement. It requires that facility operators "reduce or prevent pollutants associated with industrial activity" through (1) the implementation of the best available technology economically achievable ("BAT") for toxic and non-conventional pollutants and (2) the best conventional pollutant control technology ("BCT") for conventional pollutants. Gen. Permit, Effluent Limitation B(3) (RJN, Ex. A at 23). A facility operator can comply with this requirement by developing and implementing a Storm Water Pollution Prevention Plan ("SWPPP") that (1) complies with the requirements in § A of the General Permit and (2) includes best management practices ("BMPs")[7] that achieve BAT/BCT. *Id.*

Second, the General Permit prohibits the discharge of water that causes or contributes to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan. Gen. Permit, Receiving Water Limitation C(2) (RJN, Ex. A at 23). The EPA has promulgated statewide water quality standards for toxic pollutants in California through the California Toxics Rule, 40 C.F.R. 131.38 (2005) ("CTR"). The CTR sets out a numeric schedule for toxic pollutants.[8] A facility operator will

not be in violation of limitation C(2) if (1) the facility operator has implemented BMPs that achieve BAT/BCT and (2) the facility operator appropriately submits a report the describes the current BMPs and revisions to those BMPs and the SWPPP. Gen. Permit, Receiving Water Limitation C(3)-(4) (RJN, Ex. A at 23–24).

Third, the General Permit requires that permittees develop and implement a Storm Water Pollution Prevention Plan that meets certain requirements. Gen. Permit, § A (RJN, Ex. A at 30). The SWPPP has two major objectives: (1) to identify and evaluate sources of pollutants and (2) to identify and implement site-specific BMPS to reduce or prevent pollutants associated with industrial activities in storm water discharges. Gen. Permit, § A(2) (RJN, Ex. A at 30–31). Section A of the General Permit catalogues with significant detail what an SWPPP must contain to comply with the General Permit. A SWPPP must contain a compliance activity schedule, a description of industrial activities and pollutant sources, a description of BMPs, drawings, maps (including a site map), and relevant copies or references of parts of other plans. *Id.* A permittee must evaluate and update the SWPPP with additional BMPs necessary to achieve compliance with the General Permit. *See* Gen. Permit, Receiving Water Limitation C(3)-(4), §§ A(2) & A(9).

Fourth, the General Permit requires a permittee to develop a Monitoring and Reporting Program ("MRP"). Gen. Permit, § B. As part of the MRP, a permittee must conduct visual observations of storm

---

7. BMPs are

schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of "waters of the United States." BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spill-

age or leaks, sludge or waste disposal, or drainage from raw material storage.

40 C.F.R. § 122.2. BMPs can be structural or non-structural.

8. As discussed below, the parties dispute the applicability and impact of the CTR.

water throughout the Wet Season; must collect water samples at each outfall during specific times; must analyze these samples for specific contaminants; and must file Annual Reports with the Regional Board summarizing the visual observations, results of sampling analysis, and General Permit compliance. Gen. Permit, §§ B(3)-(5), B(14). Where permittees participate in group monitoring programs, reduced monitoring requirements apply. Gen. Permit, § B(15). Because Kramer participates in the Metals Recyclers Monitoring Group ("MRMG"), Kramer must sample from at least two storm events over the five-year period of the General Permit. *Id.* § B(15)(b).

## C. *Effluent Limitation B(3) of the General Permit*

Baykeeper first argues that there is no genuine issue of material fact that both Kramer 1760 and Kramer 1000 violated Effluent Limitation B(3) of the General Permit. In order to comply with Effluent Limitation B(3), a facility's SWPPP must include BMPs that achieve BAT/BCT. Gen. Permit, Effluent Limitation B(3). Baykeeper cites to the Benchmark Levels set out in the EPA Multi–Sector Permit and argues that these "provide an objective standard to determine if a permittee's BAT/BCT has been implemented." Pl.'s Mem. at 8. Because samples collected at both Kramer 1760 and Kramer 1000 showed pollutants in excess of these Benchmarks, Baykeeper argues, both facilities were in violation of the General Permit. Kramer argues that the use of the EPA Benchmarks is inappropriate and that there are genuine issues of material fact regarding the samples on which Baykeeper relies.

Because Baykeeper's first basis for summary judgment relies on the Court importing the EPA Benchmarks as objective measures, the Court begins by addressing the propriety of relying on those standards. The Court finds that the EPA Benchmarks are appropriate to use as objective guidelines in assessing whether Kramer has implemented BMPs that achieve BAT/BCT, but that they are only one part of such an analysis. Accordingly, as discussed below, the Court denies summary judgment on this ground.

### 1. *The EPA's Authority and Actions*

As relevant here, the Clean Water Act requires that the EPA issue certain types of guidelines, and also gives the EPA considerable discretion in how to do so.

### a. Authority to Set Effluent Limitations and Authority to Issue Permits

First, the Clean Water Act directs the EPA to set effluent limitations for certain pollutants on a national level. 33 U.S.C. § 1311(b)(2)(A). An effluent limitation is a "restriction imposed by the Director on quantities, discharge rates, and concentrations of 'pollutants' which are 'discharged' from 'point sources' into 'waters of the United States,' the waters of the 'contiguous zone,' or the ocean." 40 C.F.R. § 122.2. Effluent limitations can be technological, as well as numeric. When the EPA sets numeric effluent limitations, the Clean Water Act requires that they reflect the application of the best available technology economically achievable. 33 U.S.C. § 1311(b)(2)(A). The EPA must identify the degree of effluent reduction attainable through the application of the best control measures and practices achievable. 33 U.S.C. § 1342(b)(2). The BAT should include treatment, process and procedure innovations, and operating methods. *Id.* In assessing BAT, the EPA is required to consider factors that include but are not limited to the age of equipment and facilities involved, process employed, engineering aspects, process changes, the cost of achieving such effluent reduction, and non-

water quality environmental impact of technology, such as energy use. *Id.* For some industries, the EPA has promulgated regulations, including numeric effluent limits for storm water discharges, that apply on a national level. *See* 40 C.F.R., Subchapter N. Scrap recycling facilities are not among those industries regulated by Subchapter N.

Additionally, as mentioned above, § 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), grants the EPA the authority to issue permits regulating pollutants and discharges, as well as the discretion to delegate its permitting authority to approved states. Unless the EPA chooses to regulate on a national level, an authorized state's permit will govern storm water discharges in that state.

### b. The EPA's Multi–State General Permit ("MSGP")

Pursuant to its permitting authority under § 1342(p), the EPA has promulgated the Multi–Sector General Permit for Stormwater Discharges Associated with Industrial Activity ("MSGP"). *See* Final National Pollutant Discharge Elimination System Storm Water Multi–Sector General Permit for Industrial Activities, 60 Fed. Reg. 50804 (September 29, 2005); Final Reissuance of National Pollutant Discharge Elimination System (NPDES) Storm Water Multi–Sector General Permit for Industrial Activities, 65 Fed.Reg. 64746–01 (October 30, 2000); Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities, 73 Fed.Reg. 56572–01 (September 29, 2008) (referring to http://cfpub.epa.gov/npdes/ stormwater/msgp.cfm for the text of the 2008 MSGP). The MSGP only applies to non-delegated States; it therefore does not apply to California industrial facilities, except for those located on Indian lands.[9]

Overall, the MSGP sets out specific standards, requirements for an SWPPP, and for monitoring and reporting. Among its other provisions, the MSGP sets out benchmark levels for certain pollutants to use as a guideline in analyzing facilities' compliance with the Clean Water Act, and directs facilities to conduct monitoring on the basis of those benchmark levels. 1995 MSGP, 60 Fed.Reg. at 50824–25; 2000 MSGP, 65 Fed.Reg. at 64836–39; 2008 MSGP at 102.

As set forth in the MSGP, Benchmark levels are distinct from the effluent limitations described above. According to the various versions of the MSGP, benchmarks are the pollutant concentrations above which EPA determined represent a level of concern. The level of concern is a concentration at which a storm water discharge could potentially impair, or contribute to impairing, water quality or affect human health from ingestion of water or fish. The benchmarks are also viewed as a level that, if below, a facility presents little potential for water quality concern. As such, the benchmarks also provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. The benchmark concentrations are not effluent limitations and should not be interpreted or adopted as such. These values are merely levels which EPA has used to determine if a storm water discharge from any given facility merits further monitoring to ensure that the facility has been successful in implementing a SWPPP.

---

9. *See* 2000 MSGP, 65 Fed.Reg. at 64803; 2008 MSGP, Appendix C, C–4, available at http://cfpub.epa.gov/npdes/stormwater/msgp. cfm.

2000 MSGP, 65 Fed.Reg. at 64766–67; *see id.* at 64816 ("The results of benchmark monitoring are primarily for your use to determine the overall effectiveness of your SWPPP in controlling the discharge of pollutants to receiving waters. Benchmark values, included in Part 6 of this permit, are not viewed as effluent limitations. An exceedance of a benchmark value does not, in and of itself, constitute a violation of this permit. While exceedance of a benchmark value does not automatically indicate that violation of a water quality standard has occurred, it does signal that modifications to the SWPPP may be necessary. In addition, exceedance of benchmark values may identify facilities that would be more appropriately covered under an individual, or alternative general permit where more specific pollution prevention controls could be required."); 1995 MSGP, 60 Fed.Reg. at 50824–25 (same); 2008 MSGP at 35 ("The benchmark concentrations are not effluent limitations; a benchmark exceedance, therefore, is not a permit violation. Benchmark data are primarily for your use to determine the overall effectiveness of your control measures and to assist you in knowing when additional corrective action(s) may be necessary to comply with the effluent limitations in Part 2."). Where samples indicate concentrations in excess of benchmarks, the MSGP generally appears to require that a company evaluate its control measures and determine whether modifications are necessary. *See, e.g.*, 2008 MSGP at 35–37 (§ 6.2.1).

Benchmark limitations and effluent limitations also appear to have different relationships BAT/BCT. As described above, by statute, effluent limitations are inextricably linked to BAT/BCT. *See* 33 U.S.C. §§ 1311(b)(2)(A), 1342(b)(2). EPA Benchmarks, on the other hand, are not as linked. Rather, it appears that the Benchmarks levels are based on information such as concentration values for aquatic

life, secondary wastewater treatment regulations, and human health criteria. *See* 1995 MSGP, 60 Fed.Reg. at 50825; 2000 MSGP, 65 Fed.Reg. at 64767 (citing to 1995 MSGP). While numeric effluent limitations must take into account industry-specific BAT/BCT, the numeric guidelines reflected in the Benchmark levels do not vary among industries. The pollutants an industry must monitor does vary by industry, however; the EPA has determined whether an industry presents a risk for certain types of pollutants based on a statistical analysis of samples. *See id.*

According to the MSGP, scrap recycling facilities, which are Standard Industrial Classification Code 5093, must monitor seven chemicals. There are no numeric effluent limitations for scrap recycling facilities set forth either in 40 C.F.R. Subchapter N or in the MSGP.

### 2. *Effluent Limitations in California's General Permit*

The parties agree that California's General Permit does not by its terms incorporate the MSGP's Benchmark levels in Effluent Limitation B(3). The General Permit provides that for facilities regulated by 40 C.F.R. Subchapter N, "compliance with the effluent limitation guidelines constitutes compliance with BAT and BCT for the specified pollutants and must be met comply with this General Permit." Gen. Permit, Fact Sheet at VIII (RJN, Ex. A at 14); *Id.*, Effluent Limitation B(1) (RJN, Ex. A at 22). For industries that are not among the industrial categories listed in 40 C.F.R. Subchapter N, like the scrap recycling facilities at issue here, the General Permit provides that "it is not feasible at this time to establish numeric effluent limitations.... Therefore, this General Permit allows the facility operator to implement best management practices (BMPs) to

comply with the requirements of this General Permit." Gen. Permit, Findings ¶ 9 (RJN, Ex. A at 21). The lack of an objective standard in the General Permit has been a source of criticism. *See* Booth Decl., Ex. B. at 80. The General Permit does require, however, that permittees incorporate BMPs "that achieve BAT/BCT." Gen. Permit, Effluent Limitation B(3).

### 3. *Role of EPA Benchmark Levels in the Effluent Limitation B(3) Analysis*

Baykeeper urges the Court to look to the EPA Benchmarks as "objective standards for determining the sufficiency of BMPs." Reply at 7. Baykeeper asserts that because Kramer had numerous samples exceeding the Benchmark levels, there is no genuine issue of material fact that Kramer's BMPs did not achieve BAT/BCT, as required by the General Permit. Kramer argues that adopting Baykeeper's approach inappropriately treats the benchmarks as enforceable guidelines, even though the General Permit does not specifically incorporate them as such. Baykeeper accuses Kramer of mischaracterizing its argument. Although Baykeeper asserts that it does not "elevate[ ] EPA Benchmark levels to 'enforceable numeric limits,'" *see* Reply at 6, there is limited, if any, practical difference between that and what Baykeeper asks the Court to do in its first argument—to grant summary judgment based *solely* on samples that are above the benchmark levels. *See* Pl.'s Mem. at 10 ("Each of these discharges of polluted storm water in excess of EPA Benchmarks is a separate violation of the General Permit[.]").

■ The Court holds that the EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs, but that samples in excess of those benchmarks do not necessarily constitute a violation of the General Permit.[10] There can be no reasonable dispute that the Benchmarks are relevant to the inquiry as to whether a facility implemented BMPs. *Cf. Waterkeepers Northern California v. AG Industrial Mfg. Inc.*, 375 F.3d 913, 919 n. 5 (9th Cir.2004) (suggesting that the plaintiff appropriately pointed to EPA Benchmark values "as evidence to support its claim that [the defendant] failed to implement adequate BMPs"). As Baykeeper noted in its Reply, the Benchmarks are often used as an objective guideline by those investigating compliance. Indeed, Timothy Simpson, Vice President and principal engineer for Geomatrix Consultants, the group leader for the Metals Recyclers Monitoring Group, testified at his deposition that the MRMG uses the EPA's Benchmarks to determine which clients likely need to implement "additional measures" to remain in compliance with the General Permit. *See* Simpson Decl., ¶ 1; Simpson Depo. at 35:6–36:14. The MSGP contemplates using the Benchmark levels in precisely this way. *See* pp. 921–23, *supra*; 2000 MSGP, 65 Fed.Reg. at 64766–67 ("[T]he benchmarks also provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented.").

Although the Benchmark levels are useful objective guidelines, the Court is not persuaded it would be appropriate to hold that samples showing concentrations in excess of the Benchmark levels constitute a violation of Effluent Limitation B(3) simply by virtue of exceeding those Benchmark levels. Doing so would effectively—and inappropriately—turn these Benchmarks into numeric effluent limitations. First, the General Permit neither specifi-

---

**10.** At oral argument, Baykeeper agreed that this was the proper approach.

cally incorporates the Benchmark levels nor cites to them as helpful guidance. Second, the MSGP indicates that Benchmark levels are to be used as signals that an SWPPP may need adjusting, not as a bright-line proxy for compliance or non-compliance. Moreover, Effluent Limitation B(3) provides that BMPs must "achieve BAT/BCT." As discussed above, while effluent limitations are inextricably linked with BAT/BCT, as far as the Court can tell, EPA Benchmarks are not so linked. Without a direct link to BAT/BCT, it would be problematic to use the Benchmark levels to conclusively determine whether a facility's "BMPs achieve BAT/BCT."

Instead, the Court holds that a more comprehensive approach is necessary. The Clean Water Act, the General Permit, and applicable regulations suggest that the approach to compliance with permits requires assessments based both on industry-wide standards and on an individualized and flexible approach. For example, when the EPA sets effluent limits, it does so on an industry-by-industry basis. *See* 33 U.S.C. § 1311(b)(2)(A) (requiring that effluent limitations be set for "categories and classes of point sources"). However, the substance of each SWPPP, including the appropriate BMPs, is developed facility-by-facility. *See* Gen. Permit, § A. The Court does not doubt that an objective standard has benefits, including the ease of administration and the ease of determining when site violates the General Permit. Repeated and/or significant exceedances of the Benchmark limitations should be relevant to this determination. With respect to Effluent Limitation B(3), however, the General Permit appears to require a more comprehensive look at the BAT/BCT for the industry to determine whether a specific site's BMPs achieve BAT/BCT.

■ Baykeeper's first ground for summary judgment rests entirely on the fact that samples repeatedly show effluent limitations in excess of the benchmark levels. *See* Pl.'s Mem. at 9–10. Baykeeper's argument draws from sampling at the Kramer facilities and the opinion of Dr. Horner. As noted above, the Court agrees that sampling orders of magnitude in excess of the benchmark levels is evidence supporting Baykeeper's contention that Kramer did not have BMPs that achieve BAT/BCT. As discussed above, however, this evidence in and of itself does not establish a violation of Effluent Limitation B(3). Dr. Horner opined that "modern stormwater treatment devices can produce effluents of higher quality for many" of the contaminants set by the MSGP, and that, accordingly, "the EPA benchmarks convey some 'benefit of the doubt' on treatment capabilities to dischargers." Horner Decl. ¶ 23. According to Dr. Horner, because they accord some benefit of the doubt, these benchmarks "are in no way excessively stringent or infeasible to meet." *Id.* Although both sampling and Dr. Horner's opinion support Baykeeper's Motion, without a more comprehensive discussion of the BAT/BCT, the Court cannot find that no genuine issue of material fact remains. The SWPPP and Kramer's testimony reflect some BMPs used by the Kramer facilities; while the Court finds it doubtful that BMPs such as sweeping achieve BAT/BCT, the Court has no real discussion on these issues before it in reference to Effluent Limitation B(3). Where Baykeeper's motion included no discussion of how Kramer's BMPs compared with the BAT/BCT, the Court is not convinced that samples in excess of the Benchmark levels were sufficient to shift the burden to Kramer to dispute this claim. (To the extent Baykeeper discusses these issues with reference to requirements of the

SWPPP, the Court addresses liability on that ground below.)

### D. Receiving Water Limitation C(2) of the General Permit

█ Next, Baykeeper moves for summary judgment on the ground that the discharge from both Kramer facilities is in excess of water quality standards, and therefore in violation of the Receiving Water Limitation C(2) of the General Permit. In particular, Kramer argues that Baykeeper inappropriately relies on the California Toxics Rule. The Court holds that the California Toxics Rule is a water quality standard that applies to Kramer, and that summary judgment is warranted as to liability on that ground.

#### 1. CTR as a Water Quality Standard Under Receiving Water Limitation C(2)

The General Permit's Receiving Water Limitations provides that storm water discharges "shall not adversely impact human health or the environment." Gen. Permit, Receiving Water Limitation C(1). In particular, Receiving Water Limitation C(2) provides that storm water discharges "shall not cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan." Id., Receiving Water Limitation C(2).

The California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard. After a California court overturned the State's water quality control plan, and pursuant to § 303 of the Clean Water Act, 33 U.S.C. § 1313, the EPA promulgated the CTR "to fill a gap in California water quality standards" that had existed for several years in the absence of a State water quality control plan. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California, 65 Fed. Reg. 31682 (May 18, 2000). The EPA's Summary of the Final Rule provides that "[t]hese Federal criteria are legally applicable in the State of California for inland surface waters, enclosed bays and estuaries for all purposes and programs under the Clean Water Act." Id. "All waters (including lakes, estuaries, and marine waters) ... are subject to the criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone." Id. at 31701. For the pollutants present in the discharges from the Kramer facilities, the following pollutant concentrations apply (assuming a receiving water hardness of 100 mg/L as $CaCO_3$ and all as dissolved quantities): lead—0.065 mg/L; copper—0.013 mg/L; zinc—0.120 mg/L; and cadmium—0.0043 mg/L. 40 C.F.R. 131.38(b)(1).[11]

Kramer argues that the CTR is not applicable here for two reasons, neither of which the Court finds persuasive. First, Kramer argues that, according to California's "Policy for Implementation of Toxics

---

**11.** The CTR levels are lower than benchmark levels. See 65 Fed.Reg. at 31701 ("EPA is aware that the criteria promulgated today for some of the priority toxic pollutants are at concentrations less than EPA's current analytical detection limits. Analytical detection limits have never been an acceptable basis for setting water quality criteria since they are not related to actual environmental impacts."). Pursuant to § 1342(p)(3)(A) (which incorporates the requirements of § 1311), "industrial storm-water discharges shall achieve any more stringent limitation, including those necessary to meet water quality standards, treatment standards or schedules of compliance, established pursuant to any State law or regulation." Defenders of Wildlife v. Browner, 191 F.3d 1159, 1164–65 (9th Cir.1999)(internal quotation marks and alterations omitted).

Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California," the CTR does not apply to individual dischargers. *See* Booth Decl., Ex. A. Kramer's reading of the CTR and the Implementation Policy is unavailing. The CTR expressly applies to "all waters" for "all purposes and programs under the Clean Water Act." *See* 65 Fed.Reg. at 31682, 31701. By noting that the Implementation Policy does not apply to storm water discharges, *see* Booth Decl., Ex. A at 16 n. 1, the Implementation Policy does not purport to exempt storm water dischargers from the limits imposed by the CTR, a federal regulation. Rather, the Implementation Policy suggests that those issues are regulated by the General Permit. The General Permit requires adherence to water quality standards.[12] Second, Kramer appears to argue that its contribution to impairment by pollutants would be small. However, the CTR criteria apply "end of the discharge pipe, unless the State authorizes a mixing zone." 65 Fed.Reg. at 31701. The General Permit authorizes no mixing zone.

In sum, the CTR is a water quality standard in the General Permit, Receiving Water Limitation C(2). A permittee violates Receiving Water Limitation C(2) when it "causes or contributes to an exceedance of" such a standard, including the CTR. The General Permit provides that a facility operator "will not be in violation of Receiving Water Limitation C(2) as long as the facility operator has implemented BMPs that achieve BAT/BCT" and follows a reporting procedure. Gen. Permit, Receiving Water Limitation C(3).

### 2. Baykeeper's Samples

■ Baykeeper rests its argument for C(2) violations at the 1760 facility on sampling by Kramer on April 20, 2007 and by Baykeeper on February 11, 2007, February 22, 2007, April 20, 2007, November 20, 2007, and January 3, 2008. Baykeeper rests its argument for C(2) violations at the 1000 facility on sampling by Baykeeper on February 11, 2007 and February 22, 2007. While Kramer cannot object to the quality of its own sampling, *see Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1492 (9th Cir.1987), vacated by 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264, *judgment reinstated in* 853 F.2d 667 (9th Cir.1988) ("when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error"), it argues that Baykeeper's samples may not be reliable.

■ Kramer's objection to the reliability of these samples is twofold. First, Kramer notes that Kramer did not provide access or permission to sample storm water at its facility. Kramer Decl. ¶ 7. According to Simpson, if such samples were taken off of Kramer Metals' premises, "they may have been tainted by water from other sources." Simpson Decl. ¶ 21.[13]

---

12. This interpretation is consistent with the approach taken by the Regional Water Quality Control Board for the Los Angeles Region in its 2001 LA County MS4 Permit. *See* Cooper Reply Decl., Ex. B at 51 (defining "Water Quality Standards and Water Quality Objectives" to mean "water quality criteria contained in ... the California Toxics Rule").

13. Baykeeper has objected to the Simpson Declaration on the basis of Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 56(e). *See* Pl.'s Objections to Evidence. Though styled as an attack on Simpson's entire declaration, Baykeeper's Rule 702 objection appears primarily to challenge Simpson's "qualifi[cations] as an expert by knowledge, skill, experience, training, or education" to opine on the relevance or interpretation of EPA Benchmarks and CTR. The Court does not read Baykeeper's objection to bear on Simpson's qualifications to testify the propriety of certain samples or how to sample, and does not read his deposition testimony to be

Second, Kramer argues that the existence of fecal coliform in the samples "indicates the possibility of contamination of the samples by water from other sources." Simpson Decl. ¶ 22. Carlos Carreon, who collected Baykeeper's samples, provided a detailed explanation as to his background and experience with water quality and environmental engineering here. Carreon Decl. ¶¶ 3–4, Ex. A. Additionally, Carreon's description of the collection of the water samples contains significant detail, providing a narrative description of the location and process Carreon used, as well as Carreon's notes. *See, e.g.*, Carreon Decl. ¶ 14, Ex. H at 116, 132. Kramer's witnesses do not specifically address either Carreon's qualifications or · his sampling technique.[14] Rather than address Carreon's specific descriptions of the sampling conditions, Simpson's declaration contains only a conclusory assertion that the water sampling was performed "under undocumented conditions" and that this, combined with the presence of fecal coliform, suggests that the samples could have been tainted. Simpson Decl. ¶ 19. Simpson's assertion as to the "undocumented" nature of Carreon's samples is without merit in light of the significant detail provided by Carreon. Additionally, Simpson's conclusory statement that the presence of fecal coliform "possibly" indicates contamination does not give rise to a genuine issue of material fact as to the validity of these samples. *Id.* ¶ 22. The only supporting evidence on which Simpson relies is a similarly conclusory statement from Kramer.

*See* Kramer Decl. ¶ 7. Simpson does not, for example, explain why, based on Carreon's detailed description of his sampling techniques, those techniques were improper. More than speculation is needed to raise a triable issue of fact, and Simpson's conclusory statements are insufficient to do so with respect to these samples. *See F.T.C. v. Publishing Clearing House,* 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

### 3. *Kramer 1760*

Kramer cannot dispute the information contained in its annual reports or reports to the MRMG. *See Sierra Club,* 813 F.2d at 1492. The sampling data for that date indicates levels above the CTR standards. Horner Decl. ¶¶ 29–39. On April 20, 2007, Kramer Metals conducted samples at outfalls 1 and 2. It is undisputed that both samples had concentrations of copper, zinc, and lead significantly above the CTR standards for these pollutants. Horner Decl., Ex. C at 77; 40 C.F.R. 131.38(b).

| Parameter | Location | Result (mg/L) | CTR |
|-----------|----------|---------------|-----|
| Copper | Outfall 1 | 1.45 | 0.013 |
| Copper | Outfall 2 | 1.54 | 0.013 |
| Lead | Outfall 1 | 0.786 | 0.065 |
| Lead | Outfall 2 | 1.05 | 0.065 |
| Zinc | Outfall 1 | 2.14 | 0.12 |
| Zinc | Outfall 2 | 2.27 | 0.12 |

inconsistent with his declaration on these points. Baykeeper does not argue, for instance, that Simpson has not stated the factual basis for his opinion. *See Walton v. U.S. Marshals Service,* 492 F.3d 998, 1008 (9th Cir.2007) (In this circuit, *"[e]xpert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and rea-*

soning upon which the opinion is based are not." (internal quotation marks omitted)).

14. Kramer filed objections to Carreon's declaration on February 13, 2009. The objections the sampling paragraphs assert lack of personal knowledge in violation of Federal Rule of Evidence 602. The Court overrules these objections.

Samples taken by Baykeeper on February 11, 2007, February 22, 2007, April 20, 2007, November 30, 2007, and January 6, 2008 also indicated excesses of CTR standards for these pollutants.

Because these numbers exceed the applicable WQS, the Court finds that there was at least one violation of Receiving Water Limitation C(2) at Kramer 1760. *See* Horner Decl. ¶¶ 30, 32, 33, 35, 36, 38, 42. Kramer does not dispute Dr. Horner's assertion that Kramer did not submit a report to the appropriate regional water board, in compliance with Receiving Water Limitation C(3). *See id.* at ¶ 29. Thus, that safe harbor undisputably cannot apply.

### 4. *Kramer 1000*

Because Kramer did not take any samples at the Kramer 1000 facility, Baykeeper relies only on its own samples. These samples show an excess of the WQS for that facility on certain occasions, most often for copper and zinc. For example, the samples taken on November 30, 2007 show the following breakdown:

| Parameter | Location | Result (mg/L) | CTR |
|---|---|---|---|
| Copper | Outfall 1 | 0.3399 | 0.013 |
| Copper | Outfall 2 | 0.07684 | 0.013 |
| Lead | Outfall 1 | 0.01088 | 0.065 |
| Lead | Outfall 2 | 0.01323 | 0.065 |
| Zinc | Outfall 1 | 2.819 | 0.12 |
| Zinc | Outfall 2 | 0.04999 | 0.12 |

*See* Horner Decl., Ex. C at 78–79. On the Court's reading of the data, it reflects excesses of the WQS for these three pollutants on the following dates:

| Parameter | Location | Dates in Excess of CTR |
|---|---|---|
| Copper | Outfall 1 | 2/11/07, 11/30/07 |
| Copper | Outfall 2 | 2/11/07, 2/22/07, 4/20/07, 11/30/07, 1/6/08 |
| Lead | Outfall 1 | None |
| Lead | Outfall 2 | None |
| Zinc | Outfall 1 | 2/11/07, 11/30/07 |
| Zinc | Outfall 2 | 2/11/07, 2/22/07 |

*See id.* at 71–81. Kramer does not dispute Dr. Horner's assertion that Kramer did not submit a report to the appropriate regional water board, in compliance with Receiving Water Limitation C(3). Thus, that safe harbor undisputably cannot apply. The Court will defer ruling on the number of violations until a later time, such as in conjunction with appropriate damages.

### 5. *Summary*

For the reasons stated above, the Court holds that the CTR is an "applicable water quality standard" under Receiving Water Limitation C(2)'s prohibition on discharges that "cause or contribute to an exceedance of any applicable water quality standards." Additionally, the Court finds that there was at least one violation of Receiving Water Limitation C(2) at each facility.

### E. *Storm Water Pollution Prevention Plans*

Baykeeper next argues that the facilities' SWPPPs are inadequate in violation of the General Permit. Section A of the General Permit sets forth the requirements for site maps. The SWPPP has "two major objectives: (a) to identify and evaluate sources of pollutants" and "(b) to identify and implement site-specific best management practices (BMPs) to reduce or prevent pollutants associated with industrial activities in storm water discharges." Gen. Permit, § A(2). Although the SWPPP requirements "are designed to be sufficiently flexible to meet the needs of various facilities," there are nevertheless mandatory components. As relevant here, the SWPPP must include: (1) a Site Map, Gen. Permit § A(4); (2) a description and assessment of potential pollutant sources, *id.* §§ A(6)-(7); and (3) a narrative de-

scription of the BMPs to be implemented at the facility for each potential pollutant, *id.* § A(8). Additionally, the SWPPP must be evaluated once a year to determine whether revisions are appropriate. *Id.* § A(9). Baykeeper challenges each facility's SWPPP in four ways.

### 1. *Kramer 1760*

#### a. Identification, Description and Assessment of Potential Pollutants and Their Sources

The SWPPP must include a narrative description of the facility's industrial activities, which include storage areas, shipping and receiving areas, fueling areas, vehicle and equipment storage and maintenance areas, material handling and processing areas, waste treatment and disposal areas, and dust or particulate generating areas. *Id.* §§ A(6)(a), A(4)(e). Additionally, it must include a narrative of potential pollutant sources associated with those industrial activities, and potential pollutants that could be discharged. *Id.* § A(6)(a). The SWPPP must also include a narrative assessment of those industrial activities and pollutant sources "to determine ... [w]hich areas of the facility are likely sources of pollutants" and "[w]hich pollutants are likely to be present in sotrm water discharges." *Id.* § A(7)(a).

Baykeeper argues that there is no genuine issue of material fact that Kramer 1760's SWPPP failed to satisfy these requirements. Baykeeper first argues that the SWPPP's identification of potential pollutants is too general to comply with the General Permit: rather than listing specifics, the SWPPP's identification is more general, citing "sediment, metals, and oil" as potential pollutants. Cooper Decl., Ex. A at 15–16. A number of parts of the General Permit suggest that it requires more detail than that provided by the Kramer 1760 SWPPP. First, the example in Table B suggests that some spec-

ificity is required. Gen. Permit at Table B, RJN Ex. A at 37. In that example, the activity is listed as "fueling," the pollutant source as "spills and leaks during delivery," and the pollutant is "fuel oil." *Id.* Rather than listing "oils," the example provides some specificity as to the type of oils. Additionally, the provision explaining § A(6) repeatedly notes that an SWPPP should describe the "characteristics" of pollutants and pollutant sources. *See* Gen. Permit, §§ A(6)(iii) ("Describe ... the characteristics of dust and particulate pollutants; the approximate quantity of dust and particulate pollutants that may be deposited within the facility boundaries ..."), A(6)(v) ("All non-storm water discharges shall be described. This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges[.]"). This explanation suggests that the identification required by the General Permit should be relatively specific. Moreover, the identification of specifics is consistent with the purposes of the SWPPP, as specific types of pollutants— including specific types of particles or metals—may require different BMPs or have different BAT/BCT. Metals identified by the EPA as concerns for scrap metal recycling facilities or, at the very least, those that show up in Kramer's own testing of the facility, would be appropriate to list. Without a reasonably specific identification of potential pollutants, the identification of BMPs may be rendered meaningless in that it will be more difficult to assess whether they are effective.

■ Kramer appeals to practical concerns. *See* Def.'s Statement at ¶ 234; Kramer Decl. ¶ 4 ("Kramer Metals' operations, as a recycler of various types of scrap metal, including both ferrous and nonferrous metal, are necessarily varied, as are the types, forms, and quantities of the numerous metals we recycle. Accord-

ingly, it would be impractical for Kramer Metals to try to list specifically all those materials, as they constantly change on a daily, and sometimes even hourly basis, as metal is brought, processed, sold, and shipped."). The Court does not read Baykeeper's argument to suggest that Kramer needed to list every single type of metal or material that might be brought into its facilities; rather, it suggests that the General Permits simply requires some additional specifics, such as common pollutants associated with metals. The Court finds this characterization of the SWPPP reasonable. While Kramer cites practical concerns, Kramer's explanation does not provide an explanation of provisions in the General Permit that suggest specific pollutants would not be required. Because the Kramer 1760 SWPPP's identifications included only general indications of the types of pollutants, they lacked the specificity required to comply with the General Permit.

Additionally, Kramer has shown that the Kramer 1760 facility fails to adequately describe and assess scrap metal processing and storage. As mentioned above, the General Permit requires that the SWPPP "[d]escribe each handling and storage area, type, characteristics, and quantity of significant materials handled or stored, description of the shipping, receiving, and loading procedures, and the spill or leak prevention and response procedures." Gen. Permit § A(6)(ii). The SWPPP's description is entirely too general to satisfy these requirements. *See* Cooper Decl., Ex. A at 13 (stating that the quantity of scrap varies), 15 (one-paragraph description of storage).

b. Incorporation of BMPs That Achieve BAT/BCT

Next, Baykeeper argues that the SWPPP fails to incorporate BMPs that comply with the General Permit's require-

ment for SWPPPs. According to the General Permit, an SWPPP must include a description of the storm water BMPs to implemented. Gen. Permit, § A(8). Those BMPs "shall be developed and implemented to reduce or prevent pollutants in storm water discharges." *Id.* The General Permit requires that facility operators consider non-structural and structural BMPs. According to § A(8)(a) of the General Permit, "[n]on-structural BMPs generally consist of processes, prohibitions, procedures, schedule of activities, etc., that prevent pollutants associated with industrial activity from contacting with storm water discharges." The General Permit provides that "[f]acility operators should consider all possible non-structural BMPs options before considering additional structural BMPs." *Id.* "Where non-structural BMPs ... are not effective, structural BMPs shall be considered. Structural BMPs generally consist of structural devices that reduce or prevent pollutants in storm water discharges." *Id.* at § A(8)(b). In determining whether BMPs are effective, the General Permit suggests that visual observations, inspections, and sampling results are all relevant. *Id.* at § A(9).

■ Baykeeper argues that the non-structural BMPs have not been effective, and that the SWPPP has not incorporated structural BMPs as required in such a situation. Baykeeper's argument rests on the combination of storm water samples, visual observations by its investigators and in Kramer's reports, and a site inspection form by the Los Angeles Department of Public Works from June 2006. *See* Cooper Decl., Ex. I at 169–180; Horner Decl. ¶¶ 29–42 & Ex. C.; Cooper Decl. Exs. F, M, P, V; Carreon Decl. ¶ 10. As mentioned above, the General Permit defines non-structural BMPs as those that prevent pollutants from coming into contact with

storm water. Kramer has not presented evidence creating a genuine issue of material fact as to whether its non-structural BMPs meet this standard. Where non-structural BMPs are ineffective, i.e., do not prevent pollutants from coming into contact with storm water, an SWPPP must include structural BMPs. Gen. Permit, § A(8)(b). Though Kramer disputes whether it *actually used* structural BMPs or was implementing BMPs that achieve BAT/BCT, it is undisputed that the SWPPP itself does not include structural BMPs. Accordingly, the Court finds that Kramer's SWPPP is in violation of § A(8) of the General Permit.

#### c. Site Map

██ Baykeeper also argues that the 1760 SWPPP violates the General Permit because it does not include a Site Map as required by § A(4). In Opposition, Kramer submitted what appears to be a Site Map for the 1760 Facility. *See* Booth Decl., Ex. G; Def.'s Genuine Issues at ¶ 255. Baykeeper points out that Exhibit G is unauthenticated. It appears to the Court that Exhibit G is the only unauthenticated document in the Booth Declaration. There is no representation that the Site Map was included with the SWPPP. Kramer has not submitted a Notice of Errata. However, the Regional Board Inspection Reports and Notices of Violation repeatedly suggest that the SWPPP is complete. *See* Cooper Decl., Ex. Q. Accordingly, the Court finds that there are genuine issues of material fact as to whether the 1760 SWPPP included a Site Map.

#### d. Revisions to SWPPP

Finally, Baykeeper argues that Kramer has failed to update the SWPPP to include adequate BMPs at the Kramer facility, as required by §§ A(2) & A(9). It is undis-

puted that there has been no revision to the SWPPP, but Kramer argues that it was not required to update. While the Court finds that there are genuine issues of material fact as to whether the facility was using BMPs that achieve BAT/BCT (i.e., whether it was actually using structural BMPs), the Court has already found that the non-structural BMPs were inadequate. Accordingly, the Court finds that revisions to the SWPPP were necessary.

#### e. Summary

In sum, the Court finds that summary judgment is warranted on violations of §§ A(6), A(8), and A(9) of the General Permit.

### 2. *Kramer 1000*

#### a. Identification, Description and Assessment of Potential Pollutants and Their Sources

Like the Kramer 1760 SWPPP, the Kramer 1000 SWPPP fails to identify any specific pollutants, aside from generally listing "sediment, metals, and oil" and "metal particles." *See* Cooper Decl., Ex. B at 32, 34. Moreover, the 1000 SWPPP does not adequately describe the various processing and storage procedures, as required by § A(6)(ii). *See* Cooper Decl., Ex. B at 29, 32; Carreon Decl. ¶¶ 46–47, Ex. V; Ford Decl. ¶¶ 42–46. Accordingly, the Kramer 1000 SWPPP also violates the General Permit.

#### b. Incorporation of BMPs That Achieve BAT/BCT

The Kramer 1000 SWPPP also does not include structural BMPs. Kramer has not presented evidence that creates a genuine issue of material fact as to whether non-structural BMPs prevented pollutants from coming into contact with storm water. Again, while there are genuine issues as to whether the BMPs actually used achieved BAT/BCT, the Court finds summary judgment appropriate as to the

Kramer 1000 SWPPP's compliance with § A(8).

### c. Site Map

Baykeeper also argues that the Kramer 1000 Site Map failed to satisfy the requirements of the General Permit. The General Permit requires that the Site Map include all areas of industrial activity; locations where materials are directly exposed to precipitation; and outline of all impervious areas of the facility; and all areas subject to soil erosion. Gen. Permit § A(4)(a)-(e). Baykeeper has presented evidence showing that Kramer 1000 has large areas of exposed soil and stores substantial scrap metal and other materials without cover and directly exposed to precipitation, neither of which is reflected in the Site Map. *See* Cooper Decl., Ex. B at 30 (Site Map); Horner Decl. ¶¶ 44–46 & Ex. B at 56–61; Carreon Decl. ¶¶ 46–47 & Ex. V at 245–49. Kramer has not presented evidence showing a genuine issue of material fact as to these issues. Accordingly, the Court finds that the Site Map did not comply with the SWPPP.

### d. Revisions

For the reasons noted above with respect to the 1760 facility, the Court finds that Kramer did not revise its SWPPP as required by § A of the General Permit.

### e. Summary

In sum, the Court finds that summary judgment is warranted for violations of §§ A(4), A(6), A(8), and A(9) of the General Permit.

### F. *Monitoring and Reporting Plans*

Section B of the General Permit sets out requirements for monitoring and reporting storm water. These monitoring and reporting requirements are aimed at (1) ensuring that storm water discharges are in compliance with discharge prohibitions, effluent limitations, and receiving water limitations, and (2) assisting in the evaluation and analysis of the BMPs. *See* Gen. Permit, § B(2). By participating in the MRMG, Kramer is subject to reduced monitoring. *Id.* at § B(15). Members of the group monitoring program must conduct storm water sampling and analysis in compliance with the following requirements: (1) they must be collected from two storm events at each site during the five-year cycle that occur during scheduled facility hours and that are preceded by at least three working days without storm water discharges; (2) the samples must be taken during the first hour of discharge; (3) at least one sample must be collected from the first storm event of a particular wet season (October 1 through May 30); (4) samples must be analyzed for specific contaminants; and (5) samples must be analyzed for toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities. *Id.* at §§ B(5)(a)-(b).

### 1. *Kramer 1760*

■ It is undisputed that Kramer 1760 was designated to collect storm water samples during the 2003–2004, 2004–2005, 2005–2006, and 2006–2007, and that Kramer tested only once during this period, on April 20, 2007. Baykeeper has presented evidence that there were numerous qualifying events recorded in downtown Los Angeles, during these four seasons. *See* Cooper Decl., Ex. T.[15] While issues of fact may preclude summary judgment on many

---

**15.** Baykeeper presents a list of qualifying events drawn from data from the National Climatic Data Center Website, http://www.ncdc.noaa.gov/oa/ncdc.html. Cooper Decl. ¶ 22. Kramer objects to this evidence on the basis that it is hearsay. *See* Def.'s Genuine Issues ¶¶ 296–325. In response, Baykeeper notes that "Kramer Metals provides no basis for its objection as to hearsay." *See, e.g.,* Baykeeper's Restatement of Uncontroverted

of these examples, at the very least, Kramer's own annual reports establish that there were two qualifying events in 2003–04. While Kramer recorded visual observations, it did not sample. *See* Cooper Decl., Ex. F at 107–108; *see also* Packard Decl., Ex. C at 44.[16] By failing to take two samples, Kramer failed to comply with the requirements of the General Permit. The Court finds that genuine issues remain as to the other alleged violations of this section.[17]

### 2. *Kramer 1000*

It is undisputed that Kramer was designated to collect stormwater samples at the Kramer 1000 facility during the 2002–2003, 2003–2004, 2004–2005, and 2006–2007 wet seasons. Def.'s Statement at ¶¶ 327, 330, 338, 355. It is also undisputed that Kramer conducted no samples for Kramer 1000. *Id.* at ¶¶ 329, 332, 339, 348. For the same reasons as with Kramer 1760, the Court grants summary judgment as to the failure to conduct two samples. *See* Cooper Decl., Ex. M at 259–60 & Ex. P at 320. For the same reasons as with Kramer 1760, the Court denies summary judgment as to any other violations of this subsection.

### G. *Annual Reports*

Finally, Baykeeper moves for summary judgment on the basis that Kramer failed

to self-report any noncompliance, in violation of § A(9) of the General Permit. As this argument appears primarily to rely on the adequacy of Kramer's BMPs, see Reply at 21–23, the Court finds summary judgment inappropriate on this ground.

### III. RULE 56(f) REQUEST

Although Kramer has defended Baykeeper's Motion for Summary Judgement, it has also filed a request pursuant to Federal Rule of Civil Procedure 56(f) for a continuance of this motion. While Kramer presents this request as an alternative for the court "if the Court is not inclined to deny the motion based on the materials before it now." Opp. at 23–24.

▬▬▬ Rule 56(f) provides that if a party opposing a motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed.R.Civ.P. 56(f). "A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery

---

Facts, at ¶ 298. The Court notes that Baykeeper has the burden of showing that its evidence—proffered for the truth of the matter asserted, *see* Fed.R.Evid. 801—falls into an exception to the hearsay rule. Although it has not cited these rules specifically, Baykeeper has essentially argued that Federal Rules of Evidence 803(8) and 1006 provide for admission. These Rules likely provide for admission. As discussed below, however, the Court's holding ultimately does not rest on this evidence.

**16.** Kramer objects to the documents attached to the Packard Declaration on the basis that they are "unauthenticated and inadmissible." *See* Opp. At 19–20. *But see* Packard Decl. ¶ 4.

As Kramer cites no rules or law for his general statement, the Court is unable to discern the exact nature of Kramer's objection.

**17.** Genuine issues of fact remain, for example, as to whether a qualifying event occurred at the Kramer facility. While the Court does not consider Simpson's general statement in deposition sufficient to defeat summary judgment that qualifying events occurred, *see* Atherton Decl., Ex. A at 8:19–24, Douglas Kramer stated that no such events occurred under penalty of perjury. While the Court finds it unlikely that a storm event would occur at USC and not at Kramer 1760, it is not the Court's role to weigh evidence on such issues.

would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of San Francisco,* 441 F.3d 1090, 1100 (9th Cir.2006). A district court is within its discretion to deny a Rule 56(f) request "if the movant has failed diligently to pursue discovery in the past." *Chance v. Pac–Tel Teletrac, Inc.,* 242 F.3d 1151, 1161 n. 6 (9th Cir. 2001) (quoting *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 920 (9th Cir.1996)) (internal quotation marks omitted). That said, "a district court should continue a summary judgment motion upon a good faith showing by affidavit that the continuance is needed to obtain facts essential to preclude summary judgment." *California v. Campbell,* 138 F.3d 772, 779 (9th Cir. 1998).

Supported by an affidavit from counsel for Kramer, Kramer makes its Rule 56(f) request on two grounds. First, Kramer asserts that it did not know that Baykeeper would be relying on the water samples it collected in this Motion for Summary Judgment. Second, Kramer asserts that it was not aware Baykeeper would be using Dr. Horner as an expert witness and has not had the opportunity to cross-examine him.

Discovery is not yet closed in this case. According to the current scheduling order, stipulated by the parties, Fact Discovery Cut Off is March 3, 2009. *See* Order Re Stipulation Setting Pretrial and Trial Schedule, Docket No. 26, at 2. Expert disclosures and reports are due March 17, 2009, rebuttal expert reports are due April 21, 2009, and expert discovery cut-off is April 28, 2009. *Id.* The last day to hand-serve Motions is March 24, 2009, and the Motion cut-off is April 14, 2009. *Id.*

▆ To the extent Kramer's Rule 56(f) motion rests on Baykeeper's use of its own samples, Kramer's request lacks merit. According to Baykeeper's counsel, al-though it has been over a year and a half since Baykeeper filed this case, Kramer has conducted no discovery. Cooper Reply Decl. ¶ 9. In Baykeeper's Rule 26(a) Initial Disclosures, dated January 29, 2008, Baykeeper specifically disclosed data reports relating to storm water sampling it conducted at Kramer's facilities on February 11, 2007, February 22, 2007, and November 30, 2007. Cooper Reply Decl., Ex. D at 62. Likewise, Tom Ford, Carlos Carreon, Meredith McCarthy, and Jose Couce have been designated as witnesses since those initial disclosures. *Id.* at 64. Kramer's suggestion that it did not expect Baykeeper to rely on this information because of a conversation in which Kramer's counsel criticized Baykeeper's samples, *see* Booth Aff. ¶¶ 3–4, does not justify continuance. *See Chance,* 242 F.3d at 1161 n. 6.

Kramer's challenge as to Dr. Horner are also unavailing. As mentioned above, under the current Scheduling Order, stipulated by the parties, expert reports and disclosures are not due until March 17, 2009, rebuttal expert reports are due April 21, 2009, and expert discovery cut-off is April 28, 2009. The last day to hand-serve Motions is March 24, 2009, and the Motion cut off is April 14, 2009. Baykeeper notes that its consultant conducted a noticed site inspection at both Kramer facilities with Dr. Horner for the purposes of settlement as early as October 2007. Because Dr. Horner has been in the case since late 2007, Kramer has had ample time to take his deposition. Additionally, Kramer's insistence that it has not had a chance to cross-examine Dr. Horner, though perhaps relevant, is unconvincing here. The dates provided by the parties' own stipulated scheduling order suggest that the parties did not necessarily contemplate pre-Summary Judgment depositions of experts. More importantly, however, Kramer has failed to point to specific facts that may be

provided in such a deposition that would undermine summary judgment here.

This is not a case where discovery has just begun or the moving party has sprung new information on the defendant at the last minute. Although Kramer is correct that discovery has not yet been completed, the Court finds its explanations insufficient in the context of this case. Thus, the Court denies the Rule 56(f) request.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Baykeeper's Motion for Partial Summary Judgment.

IT IS SO ORDERED.