CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, Plaintiff,

v.

CHICO SCRAP METAL, INC., a California corporation; George Scott, Sr., individually and as trustee of George W. Scott, Sr. Revocable Inter Vivos Trust Dated September 25, 1995, Defendants.

No. 2:10–CV–01207–GEB–AC.

United States District Court, E.D. California.

Signed Aug. 14, 2015.

Filed Aug. 17, 2015.

1008

Andrew L. Packard, Laurie Ann Mikkelsen, Megan E. Truxillo, The Law Offices of Andrew L. Packard, Petaluma, CA, Robert J. Tuerck, Jackson & Tuerck, Quincy, CA, for Plaintiff.

Kimberly A. Almazan, Therese Y. Cannata, Cannata O'Toole Fickes & Almazan, LLP, San Francisco, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART EACH PARTY'S SUMMARY JUDGMENT MOTION

GARLAND E. BURRELL, JR., Senior District Judge.

Pending are cross motions for summary judgment on the claims alleged in Plaintiff's Third Amended Complaint ("TAC") under the federal Clean Water Act ("CWA") and California Health & Safety Code section 25249.

### I. UNCONTROVERTED FACTS [1]

Defendants "own and/or operate the [scrap metal recycling] facility located at 1855 Kusel Road in Oroville, California ('the Facility')." (Pl.'s SUF ¶¶ 1, 8, ECF

---

1. The following facts concerning the motions are either admitted or "deemed" uncontroverted since they have not been controverted with specific facts as required by Local Rule 260(b).

No. 189.) "The [F]acility's primary purpose is to receive, separate, and ship recyclable ... scrap metals, plastics, and CRV items (bottles and cans).... The received materials are separated at the facility, bailed and shipped." (Packard Decl. Ex. SS, Resp. No. 12 p. 9, ECF No. 168–7.) The Facility has "stockpiles of metal and other debris" and "[m]ost of the industrial activities at the Facility occur outdoors." (Pl SUF ¶ 11.) When it rains, "[s]torm water associated with [the Facility's] industrial activities is discharged from the Facility." (Pl.'s SUF ¶ 10.)

## II. LEGAL STANDARD

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." ...
The moving party has the burden of establishing the absence of a genuine dispute of material fact.
*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir.2014) (quoting Fed.R.Civ.P. 56(a)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A "dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment "evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Sec. & Exch. Comm'n v. Todd*, 642 F.3d 1207, 1215 (9th Cir.2011) (citing *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir.2001)).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ... or ... showing that the materials do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
Fed.R.Civ.P. 56(c)(1).

However, if the nonmovant does not "specifically ... [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." *Beard v. Banks*, 548 U.S. 521, 527, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). A district court has "no independent duty 'to scour the record in search of a genuine issue of triable fact.'"
*Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir.2010) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)).

## III. DISCUSSION

### A. Objections

#### 1. Rule 26

Each party objects to what it characterizes as expert testimony evidence; Plaintiff moves to strike the declaration of Bryan Gartner submitted in support of Defendants' motion and Defendants move to exclude paragraphs 13–22 and the attached exhibits L–U from the Declaration of John Lane submitted in support of Plaintiff's motion.

Each objection is made under Federal Rule of Civil Procedure 26(a)(2)(B), which requires a party to disclose a written report for an expert witness who "is retained

or specially employed to provide expert testimony in the case;" the report must include *"a complete statement of all opinions the witness will express and the basis and reasons for them; the facts of data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them."* (emphasis added.)

Plaintiff argues the Gartner declaration offers expert testimony and therefore Defendants violated Rule 26 by not disclosing his opinions earlier. Defendants counter the declaration does not contain expert testimony and instead discloses Gartner's personal observations based on his work at the Facility.

 The Gartner declaration details Gartner's work conducted on behalf of Defendants in connection with the Facility's efforts to comply with a Department of Toxic Substance Control Order. Plaintiff has not shown that the subject matter of Gartner's declaration was subject to Rule 26's disclosure requirements. Therefore, Plaintiff's motion challenging the declaration is denied.

Defendants argue the referenced portions of Lane's declaration should be excluded because they include new opinions on the adequacy of the Facility's Best Management Practices ("BMPs").

Plaintiff responds that although Lane was retained as an expert on whether discharges from the Facility reach the Feather River, his factual statements regarding BMPs serve only to authenticate Exhibits L–U, which are photographs he took of the Facility, and therefore the referenced portions of his declaration are not subject to the expert disclosure rule. Plaintiff argues that even though lane took the photographs he has not given an opinion based on what is depicted in the photographs.

 Exhibits L–U attached to the Lane declaration are photographs of the Facili-

ty, and paragraphs 13–22 of the declaration declare when and how Lane took the referenced photographs. Therefore, Defendants have not shown the referenced portions of Lane's declaration are subject to Rule 26's disclosure requirements and their motion challenging the declaration is denied.

### 2. Evidentiary Objections to Declarations

Plaintiff submitted 126 evidentiary objections to the content of the declarations Defendants submitted in support of their motion and their opposition to Plaintiff's motion. Each objection has been considered. The objections are raised under Federal Rules of Evidence 701, 703, and/or 802, and the discussion in this Order infra herein reveals each objection is either sustained or overruled.

### B. Plaintiff's Requests for Judicial Notice

Plaintiff supports its motion with a request that judicial notice be taken of exhibits A–N attached to its Request for Judicial Notice (ECF No. 166), and supports its opposition to Defendants' motion with a request that judicial notice be taken of exhibits A–B attached to a second Request for Judicial Notice. (ECF NO. 182.) Defendants oppose judicial notice being taken of exhibits C–F, I–K, and M–N that support Plaintiff's motion and exhibit A that supports Plaintiff's opposition.

 Each document for which Plaintiff requests judicial notice is, with the exception of Exhibit I, a government record. Government records are susceptible to judicial notice when "relevant to an[ ] issue" before the court. *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 392 n. 7 (9th Cir.2000) ("In this case though, we deny such a request [for judicial notice], because the [documents] are not relevant to any

issue on appeal."). Plaintiff has shown that each of these exhibits is relevant to the pending motions. Therefore, its request for judicial notice of these exhibits is granted.

Plaintiff, however, has not shown Exhibit I, a report created by a third-party titled "Lower Feather River HUC/Honcut Creek Watershed, Existing Condition Assessment," is susceptible to judicial notice. Therefore, Plaintiff's request for judicial notice of Exhibit I is denied.

### C. Jurisdictional Issues

The parties seek summary judgment on the following issues concerning the federal court's subject matter jurisdiction: whether Plaintiff has sufficiently established the element of its CWA claims that requires it to show the discharges about which it complains are into "navigable waters," and whether Plaintiff has established it has standing to prosecute this lawsuit.

#### 1. "Navigable Waters"

■ An essential element of Plaintiff's CWA claims requires it to show the pollutant discharges about which it complains were discharged "into navigable waters [of the United States] without a permit." *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 611, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992). Here "[t]he [relevant definition of the] term 'waters of the United States' means[:] All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 C.F.R. § 328.3(a)(1). The Feather River is a navigable water of the United States. *See N. Bloomfield Gravel–Mining Co. v. United States*, 88 F. 664, 665 (9th Cir.1898) (finding the Feather River to be navigable).

Plaintiff argues the Facility discharges pollutants into the Wyman Ravine, from which water flows into the Honcut Creek and then into the Feather River, and that since the Wyman Ravine is a tributary of the Feather River, it is considered "navigable waters" of the United States under the CWA. The uncontroverted facts establish that the Wyman Ravine, Honcut Creek, and Feather River are downstream from the Facility, and that the Feather River specifically is 19 miles downstream of the Facility. (Defs.' SUF ¶¶ 21–23.)

■ Plaintiff argues sufficient connectivity exists between the Facility and the Feather River to establish that the Facility's pollutants discharge into "navigable waters." Plaintiff cites as support for its position, the report of its geologist, John Lane, in which Lane opines that discharges from the Facility flow into a ditch running parallel to Kusel Road and then into an unnamed seasonal intermittent stream; and from the stream, water flows for 1.5 miles before discharging into the Wyman Ravine, which is hydrologically connected to Honcut Creek and the Feather River. (Lane Decl. Ex. A pg. 4–5, ECF No. 170–1.) Lane states in his report:

> On April 4, 2011, [he] observed continuous storm water flow from the Facility under Kusel Road ... into the unnamed seasonal stream, past a stockpond approximately 30 feet in diameter and into Wyman Ravine. This inspection was conducted from a helicopter and the flight is documented in [photographs attached to his report].

(Lane Decl. Ex. A p. 5, ECF No. 170–1.) Plaintiff argues Lane's report demonstrates the Facility's pollutants discharge into navigable waters since the Wyman Ravine is a tributary of the Feather River, and under the CWA, tributaries of navigable waters are themselves considered navigable waters. (Pl.Mot. 16:20–25.)

Defendants argue that Lane's personal observations of connectivity between the Facility and the Wyman Ravine are "pure

speculation" since Lane "initially provided no evidence of connectivity [and notwithstanding his deposition testimony that he observed such connectivity and took photographs of his observations,]" the "photographs fail to establish a clear and unbroken connection between the Facility and the Wyman Ravine." (Def. Mot. 17:5; 17:24–27.)

If other bodies of water are conduits for the Facility's discharges to "seep into the navigable [Feather River]," and the Facility's discharges "significantly affect the physical, biological, and chemical integrity of the [Feather] River," then the Facility's discharges are "subject to the CWA." *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 996 (9th Cir. 2007) (interpreting *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006)). "Even ... intermittent ... [see page is sufficient]." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 534 (9th Cir.2001).

Since Plaintiff has shown discharges from the Facility reach the Wyman Ravine and the Wyman Ravine seeps into the Feather River, Plaintiff's motion on this issue is granted and Defendants' motion is denied.

### 2. Standing

Concerning the issue of standing, the uncontroverted facts establish that Plaintiff California Sportfishing Protection Alliance is a non-profit corporation. (Pl SUF ¶ 165.) A non-profit organization "has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Plaintiff bears the burden of establishing standing, and as "an indispensable part of the plaintiff's case, [it] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Plaintiff satisfies the second and third elements of organizational standing since its claims do not require the participation of individual members and the interests at stake are germane to the organization's stated purpose, which is "the preservation of land and aquatic habitat for scientific, ... [and] recreational ... opportunities." (Pl.'s SUF ¶ 166.) The parties dispute whether Plaintiff meets the first prong of the standing inquiry which requires Plaintiff to evince that one of its members has standing to sue in his or her own right. To establish individual standing:

First, the [member] must have suffered an *'injury in fact'*—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a *causal connection* between the injury and the conduct complained of—the injury has to be *fairly traceable* to the challenged action of the defendant, and not the result of independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (emphasis added). To demonstrate standing, Plaintiff presents three of its members as standing witnesses: Bill Jennings, Jim Crenshaw, and Chris Shutes (collectively the "Standing Witnesses"), who gave deposition testimony regarding their use of the Feather River.

Defendants argue Plaintiff cannot demonstrate the Standing Witnesses suffered an injury in fact fairly traceable to Defendants' conduct. Specifically, Defendants argue that the deposition testimony of each Standing Witnesses reveals that none of them have used either the Wyman Ravine or the Honcut Creek, as required to show an injury that is fairly traceable to the Facility, and that the types of aesthetic and recreational harm about which each Standing Witness complains is insufficient to demonstrate an injury in fact. Jennings did not discuss the Wyman Ravine during his deposition and could not recall spending time at Honcut Creek, (Cannata Decl. ISO Def. Mot. Ex. D, 74:1–13; 77:10–13, ECF No. 195); and Crenshaw and Shutes each testified he had never been on the Honcut Creek or the Wyman Ravine. (Cannata Decl. ISO Def. Mot. Ex. B, 77:1–5, ECF No. 195; Cannata Decl. ISO Def. Mot. Ex. F, 122:18–21; 155:21–156:1, ECF No. 195.)

Plaintiff responds that the Standing Witnesses "testified to historical and ongoing use of" the Feather River, which demonstrates their injuries are fairly traceable to Defendants' conduct since the Feather River is only 19 miles from the Facility. The uncontroverted facts establish the Feather River is 19 miles downstream of the Facility and that the Standing Witnesses each use the Feather River for aesthetic and recreational purposes. (Defs.' SUF ¶ 23; Pl.'s SUF ¶¶ 173–176.)

▮ "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activities." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (finding a standing witness who "canoed approximately 40 miles downstream" from the facility at issue, but who stated their enjoyment of the land was diminished by the defendant's alleged discharge of mercury in violation of the CWA "adequately documented injury in fact").

▮ The Standing Witnesses' aesthetic and recreational use of the Feather River evince that they have "reasonable concerns about the effects of [Defendants'] discharges" on their interests in the Feather River. *Laidlaw*, 528 U.S. at 184, 120 S.Ct. 693. Since the Feather River is approximately 19 miles downstream from the Facility," (Defs.' SUF ¶ 23), it is sufficiently close to the Facility to demonstrate each Standing Witnesses' injury is fairly traceable to Defendants' conduct. *Laidlaw*, 528 U.S. at 183, 120 S.Ct. 693. Therefore, on this issue, Plaintiff's motion is granted and Defendants' motion is denied.

## D. CWA Claims

The parties cross move for summary judgment on Plaintiff's claims alleged under the CWA, in which Plaintiff alleges Defendants engaged in conduct proscribed by the CWA by violating the terms of California's General Industrial Storm Water Permit (the "General Permit"), which Defendants were issued.

▮ "The Clean Water Act prohibits the discharge of pollutants from a 'point source' into the waters of the United States without a permit issued under the terms of the National Pollution Discharge Elimination System [ ("NPDES") ]." *Envt'l Def. Ctr., Inc. v. United States EPA*, 344 F.3d 832, 841 (9th Cir.2003). "The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal." *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 915 (9th Cir.2004). "An NPDES permit serves to transform generally applicable effluent limits and other standards . . . into obligations . . . of the individual discharger." *Envt'l Prot.*

*Agency v. Cal. ex rel. State Water Res. Control Bd.,* 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). "NPDES permits are issued by [the] EPA or States that have been authorized by EPA to act as NPDES permitting authorities." *Envt'l Def. Ctr., Inc. v. U.S. EPA,* 344 F.3d 832, 841 (9th Cir.2003).

> "Much of the responsibility for administering the NPDES permitting system has been delegated to the states. States may issue individual permits to industrial discharges or may cover many discharges under the terms of one general permit. California has issued a general permit to cover industrial discharges. In order to be covered under California's General Permit, individual dischargers must file a notice of intent with the state."

*Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.,* 375 F.3d 913, 915 (9th Cir.2004). Defendants filed "a notice of intent" with the California Regional Water Board ("Water Board"), which was approved on December 10, 2007. (Defs.' SUF ¶¶ 1, 5, ECF No. 184.) "Private citizens may sue under the Clean Water Act to enforce the specific provisions of [the] California[ ] General Permit." *Waterkeepers N. Cal.,* 375 F.3d at 915 (citing 33 U.S.C. § 1365(a)(1), (f)(6)).

Plaintiff alleges Defendants violated the terms of the General Permit as follows: (1) discharging contaminated storm water contrary to Section C of the General Permit; (2) failing to develop and implement an adequate Storm Water Pollution and Prevention Plan ("SWPPP") contrary to Section A of the General Permit; (3) failing to implement Best Available Technology Economically Achievable ("BAT")/Best Conventional Pollutant Control Technology ("BCT") contrary to Order B of the General Permit; and (4) failing to implement an adequate Monitoring and Reporting Plain ("MRP") contrary to Section B of the General Permit.

## 1. Storm Water Discharges

Both parties seek summary judgment on Plaintiff's claim that Defendants violated Section C of the General Permit 131 times by failing to submit a report to the Water Board when the Facility's storm water discharges contained levels of copper, lead, and/or zinc in excess of the applicable water quality standards.

> Section C(2) of the General Permit states in part: Storm water discharges ... shall not *cause or contribute to an exceedance of any applicable water quality standards* contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan.

(General Permit Pg. 4.) However, Section C(3) states:

> A Facility operator will not be in violation of [Section] C.2. as long as the facility operator has implemented BMPs that achieve BAT/BCT and ... [t]he facility operator ... submit[s] a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce any pollutants that are causing or contributing to the exceedance of water quality standards.

(General Permit p. 4.) Section C(4) states:

> [the referenced report must be submitted to the Water Board] within 60 days after either the Facility operator or the ... Water Board determines that discharges are causing or contributing to an exceedance of an applicable water quality standard.

(General Permit pgs. 4–5.) The uncontroverted facts establish that Defendants did not submit a report to the Water Board in response to a storm water discharge exceeding an applicable water quality standard. (Pl.'s SUF ¶ 164.)

Plaintiff argues the California Toxic Rules standards ("CRT standards") are "an[ ] applicable water quality standard" under the General Permit, and that samples of water discharged from the Facility on 131 occasions show levels of copper, lead, and/or zinc in excess of the CTR standards. (See Pl.'s SUF ¶¶ 115–163.)

The CTR "promulgates criteria for priority toxic pollutants for the State of California." 40 C.F.R. § 131.38. For storm water discharges, the following pollutant concentrations apply:

Copper: 0.013 mg/L

Lead: 0.065 mg/L

Zinc: 0.12 mg/L

*Id.*

Defendants argue the CTR standards are inapplicable to the Facility and therefore they were not required to report to the Water Board each time a sample revealed levels of copper, lead, and/or zinc in excess of the CTR standards. Defendants further argue that even if they were required to report such discharges, Plaintiff has not presented evidence demonstrating that a portion of the 131 water samples Plaintiff references represent *the Facility's* water quality since Plaintiff has not shown that the samples came from inside the Facility.

Plaintiff argues that by failing to file reports with the Water Board, Defendants violated section C2 of the General Permit, citing *Santa Monica Baykeeper v. Kramer Metals, Inc. ("Kramer")*, 619 F.Supp.2d 914 (C.D.Cal.2009), in support of their position. In *Kramer* a plaintiff sued a scrap metal recycling facility contending its storm water discharge samples contained levels of chemicals exceeding the CTR, and contended since defendant failed to report the excess levels to the Water Board, it violated Section C of the General Permit. *Id.* at 926. The *Kramer* defendant countered that the General Permit did not require it to report violations of the CTR

standards. The *Kramer* court disagreed, stating "the [CTR standard] is a water quality standard that applies to [Defendant]." *Id.* The court reasoned that "[t]he CTR [standards] expressly appl[y] to 'all waters' for 'all purposes and programs under the Clean Water Act'" and that storm water discharges are "regulated by the General Permit," which requires "adherence to water quality standards," including the CTR standards. *Id.* at 927.

Defendants argue *Kramer* was wrongly decided and that the "CTR's criteria ... are not applicable to storm water discharges ... and do not establish compliance or noncompliance with the General Permit," relying primarily on *Divers' Envt'l Conservation Org. v. State Water Res. Control Bd.*, 145 Cal.App.4th 246, 256, 51 Cal. Rptr.3d 497 (2006), EPA statements, and statements from a Water Board employee. In *Divers*, the California Court of Appeal stated: "In regulating storm water permits the EPA has repeatedly expressed a preference for doing so by way of BMP's rather than by way of imposing ... water quality-based numeric limitations." Defendants also cite to an EPA report entitled, "Economic Analysis of the California Toxic Rules," in which the EPA states "[t]he State of California has significant flexibility and discretion as to how it chooses to implement the CTR within the NPDES permit program," and argue therefore the CTR standards were not meant to constitute a per se violation of the General Permit. (Def. Opp'n 17:16–18.) Defendants further argue that Water Board scientist Scott Zaitz gave deposition testimony that to his knowledge the CTR are not part of the General Permit. (Cannata Opp'n Decl. Ex. A 135:14–22, ECF No. 195–1.)

Plaintiff replies that *Divers* is inapposite since the *Divers* court was not analyzing the General Permit, and Defendants' reli-

ance on the EPA's Economic report "does not support . . . . conclu[ding] that the CTR [standards are inapplicable to facilities covered by the General Permit]" since *Kramer* "specifically rejected the argument that Defendants repeat here." (Pl. Reply 10:6–8; 9:16–19.) Plaintiffs also respond that Defendants citation to Zaitz's testimony is unpersuasive since he was "not speaking on behalf of the Water Board" and his testimony "relates solely to his own practice." (Pl. Reply 10:22–23; 11:3–4.)

CTR standards state:

[The] EPA . . . promulgate[d] [the standards] to fill a gap in California water quality standards that was created in 1994 when a State court overturned the State's water quality control plans which contained water quality criteria for priority toxic pollutants. Thus, the State of California has been without numeric water quality criteria for many priority toxic pollutants as required by the [CWA], necessitating this action by [the] EPA.

65 Fed.Reg. 31682. *Kramer* states the CTR "is a water quality standard [as the phrase is used] in the General Permit, [Section] C(2)." 619 F.Supp.2d at 927.

The uncontroverted facts establish Defendants never submitted a report to the Water Board in response to receiving a storm water discharge sampling result that violated a water quality standard. (Pl.'s SUF ¶ 164.) Therefore, each time Defendants received sampling results in excess of the CTR standards, they violated Section C of the General Permit.

Plaintiff argues Defendants violated Section C of the General Permit 131 times. Plaintiff argues Defendants' own samples reveal sixty-five instances where the level of copper, lead, and/or zinc exceeded the CTR standards, (Pl.'s SUF ¶¶ 118–128, 133, 136, 139, 140, 151–159, 163), and additional samples taken by third-parties reveal sixty-six other instances where the

level of copper, lead, and/or zinc exceeded the CTR standards. (Pl.'s SUF ¶¶ 115–117, 129–132, 134–135, 137–138, 141–150, 157, 160–162.)

 Since the evidence concerning the sixty-five samples Defendants collected and analyzed is uncontroverted, Plaintiff's motion concerning these samples is granted and Defendants' motion is denied. Defendants also do not dispute the sample results taken on December 11, 2014 from SWSL2, at 9:10 AM and 2:50PM, which evince four additional violations. (Pl.'s SUF ¶¶ 160–161.) Therefore, Plaintiff's motion as to these samples is granted and Defendants' motion is denied.

 ▪ Defendants argue that Plaintiff fails to demonstrate the remaining samples taken represent the quality of the Facility's storm water discharges since it is not evident that the samples were taken from the Facility or from an outside source; Defendants argue the analysis of this co-mingled storm water would not accurately reflect the levels of copper, lead, and/or zinc in the Facility's discharges, and therefore unless Plaintiff can identify the source of the remaining water samples, it cannot succeed on its claims based thereon. (Pl.'s SUF ¶¶ 115–117, 129–132, 134–135, 137–138, 141–150, 157.) Plaintiff fails to present evidence that sufficiently identifies the origin of the remaining water samples and consequently has not met its burden to show these samples are the Facility's discharges. Therefore, each motion concerning the remaining sixty-two violations is denied.

### 2. Storm Water Pollution Prevention Program ("SWPPP")

The parties cross move for summary judgment on Plaintiff's claim that Defendants violated the General Permit by failing to develop and implement an adequate

Storm Water Pollution Prevention Program ("SWPPP").

> [T]he General Permit requires that permittees develop and implement a [SWPPP] that meets certain requirements. The SWPPP has two major objectives: (1) to identify and evaluate sources of pollutants and (2) to identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. Section A of the General Permit catalogues with significant detail what an SWPPP must contain to comply with the General Permit. A SWPPP must contain [*inter alia* ] ... maps (including a site map).

*Kramer Metals, Inc.*, 619 F.Supp.2d at 920. Plaintiff alleges Defendants violated the General Permit since 1989 because from 1989–2007 the Facility did not have a SWPPP and the site maps on the SWPPPs the Facility eventually created are missing required information.

### a. Failure to Develop a Site Map

Plaintiff argues Defendants violated Section E(2) of the General Permit from the time the Facility opened until 2007 since it is uncontroverted that the Facility "did not develop any SWPPP" prior to 2007. (Pl SUF ¶ 15.) Section E(2) of the General Permit states: "Facility operators ... must develop and implement a SWPPP in accordance with [S]ection A of this General Permit when the industrial activities begin." (General Permit p. 6.)

Defendants respond that since they created a SWPPP "prior to the date on which [Plaintiff] filed its lawsuit," Plaintiff's claim "is based on a wholly past violation," and therefore summary judgment in their favor is warranted, citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). (Def. Opp'n 23:23–24.)

In *Gwaltney*, the Supreme Court held that the CWA requires "that citizen-plaintiffs allege a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past [violator] will continue to [violate the CWA] in the future," and that evidence of "wholly past violations" cannot support a citizen-plaintiff's claim under the CWA. *Gwaltney*, 484 U.S. at 57–58, 108 S.Ct. 376.

 Plaintiff filed its initial complaint in this action on March 17, 2010. (ECF No. 1.) Since the uncontroverted facts evince that Defendants created a SWPPP prior to Plaintiff initiating this lawsuit, Plaintiff's claim against Defendants for failing to create a SWPPP alleges a "wholly past violation" for which a citizen-plaintiff cannot sue. *Gwaltney*, 484 U.S. at 58, 108 S.Ct. 376. Therefore, Plaintiff's motion on this issue is denied and Defendants' motion is granted.

### b. Failure to Include Required Information

Plaintiff also alleges the Facility's SWPPPs are inadequate since the SWPPP site maps are missing the following required information: (1) points of discharge from the Facility, (2) structural control measures that affect storm water discharge, (3) portions of the Facility's drainage areas that are impacted by run-on from the surrounding area, and (4) areas of soil erosion.

#### i. Points of Discharge

Plaintiff argues Defendants violated Section A(4) of the General Permit since "the Facility discharges storm water from the *West Gate* and from the *Southern property boundary*, [but] neither of these discharge points have ever been identified [on the SWPPP site map]" as required by Section A(4). (Pl. Mot. 7:14–16 (emphasis added).) Plaintiff supports its position citing the uncontroverted facts that "[t]he Facility

maps attached to the 2008, 2010, 2012, and 2013 SWPPPs do not identify the West Gate or the west end of the property's southernmost boarder as discharge points." (Pl.'s SUF ¶ 16.)

Section A(4) of the General Permit states the SWPPP's site map shall include: "[t]he location of the storm water collection and conveyance system, *associated points of discharge,* and direction of flow." (General Permit p. 14 (emphasis added).)

Defendants respond they did not violate Section A(4) of the General Permit by failing to list the referenced locations as points of discharge since the locations are "not part of [the Facility's] storm water collection and conveyance system." (Def. Opp'n 25:1–2.) Defendants support this argument citing the Declaration of Kim Scott, the Facility's Environmental and Safety Coordinator, who declares the referenced points of discharge "are not part of the Facility's storm water collection conveyance system." (K. Scott Decl. Opp'n ¶ 4, ECF No. 194.)

Plaintiff replies that Defendants cannot explain why the referenced discharge points "are not part of [the Facility's] storm water conveyance system," but provides no evidence to rebut Scott's averment. (Pl. Reply 14:11–26.)

 Section A(4) of the General Permit does not require SWPPP site maps to include points of discharge that are not associated with a facility's storm water collection and conveyance system, and the Scott Declaration evinces that the West Gate and the Southern property boundary are not part of the Facility's storm water collection and conveyance system. Therefore, Plaintiff's motion on this issue is denied and Defendants' motion is granted.

#### ii. Structural Control Measures

Plaintiff argues Defendants violated Section A(4) of the General Permit since the Facility's "SWPPPs call for straw wattles

and absorptive socks to be placed around the large ... scrap metal piles at the Facility," yet "none of these structural BMPs have ever been identified on any of the Facility maps" as required by Section A(4). Plaintiff supports its position citing the uncontroverted facts that the SWPPPs identify straw wattles and absorbent socks as BMPs used at the Facility, yet "no straw wattles or absorbent socks have ever been identified on any of the Facility's SWPPP [site] maps." (Pl.'s SUF ¶¶ 20–21.)

Section A(4) of the General Permit states in part that the site map shall include: "any structural control measures that affect storm water discharges." (General Permit p. 14.)

Defendants respond that Section A(4) of the General Permit did not require them to identify straw wattles or absorbent socks on the SWPPP site maps since these "are not considered structural BMPs (rather they are considered non-structural BMPs)." (Def. Opp'n 25:25–26:2.) Defendants cite in support of their position the averments from Damon Brown, Defendants' expert geologist, where he avers straw wattles and absorbent socks are non-structural BMPs since "they are not permanent," and "must be periodically replaced." (Brown Decl. Opp'n Pl. Mot. ¶ 6, ECF No. 192.) Brown also declares "[s]traw wattles are primarily used to prevent soil erosion," and "[a]bsorbent socks are primarily used as part of spill clean-up equipment." (Brown Decl. Opp'n Pl. Mot. ¶¶ 4–5, ECF No. 192.)

Plaintiff replies that straw wattles and absorptive socks are structural rather than non-structural BMPs since Defendants have identified them as such in their SWPPPs and "Defendants' expert ... conceded that the straw wattles and absorptive socks are structural." (Pl. Mot. 7:16; Pl. Reply 15:10–11.) However Plaintiff's

purported support does not address the distinction between structural and non-structural BMPs.

The General Permit states structural BMPs "generally consist of structural devices that reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges." (General Permit p. 21.) In contrast, the General Permit states that non-structural BMPs "generally consist of processes, prohibitions, procedures, schedule[s] of activities, etc., that prevent pollutants associated with industrial activities from contacting with storm water discharges and authorized non-storm water discharges. They are considered low technology, cost-effective measures." (General Permit p. 19.) Non-structural BMPs can include "spill clean-up procedures" and "sediment and erosion control activities." (General Permit p. 19–20.)

██ Section A(4) of the General Permit does not require a site map to include non-structural BMPs, and averments in Brown's declaration evince that straw wattles and absorptive socks are non-structural BMPs. Since Plaintiff has not sufficiently controverted Defendants' evidence, its motion on this issue is denied and Defendant's motion is granted.

### iii. Drainage Areas Impacted by Run–On

Plaintiff argues Defendants violated section A(4) of the General Permit because "the Facility has historically been subject to significant storm water run-on from an adjacent facility *at the southeast corner,* causing [water] pooling, [but] neither this run-on nor its associated discharge[s] have ever been identified on any of the Facility's site maps" as required by the General Permit. (Pl.Mot. 7:20–22.) Plaintiff supports its position citing deposition testimony of Kim Scott, Jihan Gray, and Defendants' expert geologist Damon Brown, in which each discusses run-on from an adjacent facility named Apex Lumber ("Apex"). (Pl.'s SUF ¶ 22.)

Section A(4) of the General Permit states that site maps shall include "portions of the drainage area impacted by run-on from surrounding areas." (General Permit p. 13.)

Defendants argue they were not required to include references to run-on at the southeast corner of the Facility on the SWPPP site map since "there is typically no run-on in that area" and the occasions where run-on has occurred, happened during the "breach of a berm ... [that] was immediately repaired." (Def. Opp'n 27:22–25.) Defendants support their position citing the following averments in Kim Scott's declaration:

> [The Facility] is bordered on the south and southeast by a facility called Apex Lumber, a logging and forestry equipment sales company. During the 2008–2009 and 2009–2010 storm seasons, there was no run-on from the Apex facility ... because, at that time, [the Facility] had large work product piles [preventing run-on].... Prior to the 2010–2011 storm season, [the Facility] moved the work product piles .... [and] Apex agreed to, and did, create a small pond on the Apex facility ... to eliminate run-on.... Unfortunately, during the course of the 2010–2011 storm season, I noticed slight run-on from Apex on at least one occasion.... Apex then agreed to, and did create a trenched and bermed area near the southern fence line between the Facility and Apex prior to the 2011–2012 storm season. [The Facility] personnel inspected this southern fence line/southeastern corner on a weekly basis during the 2011–2012 and 2012–2013 storm seasons. Those inspections revealed no run-on from Apex to the Facility. During the 2013–2014 storm season ... we

experienced a significant storm event that overwhelmed the BMPs that we had in place near the southern fence line.... I noticed a breach of our bermed area .,.. [which] appeared to create either runoff or run-on or both (it was difficult to determine) between [the Facility] and Apex (basically storm water pooled in this area). I immediately worked with a team to place sandbags and hay bales in this area to close off this area of comingled storm water. As a result, during the summer of 2014, in advance of the 2014–2015 storm season, [the Facility] implemented [a BMP] intended to improve the elevation of the southern border and eliminate the potential of run-on from Apex ..., [which has] worked ... meaning that it is effectively preventing ... run-on at the southern border.... Because the issue of run-on ... at the southern end of the Facility was both unintended and immediately repaired (during the storm), I did not include reference to run-on from Apex on [the Facility's] site map(s)." (K. Scott Decl. in Opp'n Pl. MSJ ¶¶ 6–7, ECF No. 194.)

 Scott's averments evince that the Facility experienced run-on from Apex Lumber at the southeast corner during the 2010–2011 and 2013–2014 storm seasons, which was not referenced on the SWPPP site maps; however, Section A(4) of the General Permit requires site maps to identify "portions of the drainage areas impacted by run-on from surrounding areas." (General Permit p. 13.) Therefore, Plaintiff's motion on this issue is granted and Defendants' motion is denied.

### iv. Areas of Soil Erosion

Plaintiff argues Defendants violated Section A(4) of the General Permit because "more than half of the Facility is covered in pervious soil, [yet] none of the [SWPPP site] maps identify any 'areas of soil ero-sion' as required by [Section A(4) of] the [General] Permit." (Pl.Mot. 8:1–3.) Plaintiff supports its position citing the uncontroverted facts that the Facility contains some amount of pervious soil and "Defendants' expert has admitted that none of the Facility [SWPPP site] maps identify any 'areas of soil erosion.'" (Pl.'s SUF ¶¶ 26–27.)

Section A(4) of the General Permit states in part that site maps shall include "[the] direction and flow of each drainage area, on-site surface water bodies, and *areas of soil erosion.*" (General Permit p. 13 (emphasis added).)

Defendants respond that the Facility "does not have any areas of soil erosion" and "[j]ust because there is dirt on the Facility does not mean that there will be soil erosion[,]" contending that "[f]actors such as slope, elevation, compactions, vegetation, place[ment] of straw wattles, and related BMPs impact the potential for erosion." (Def. Opp'n 29:19–20; 29:25–30:1.) Defendants support their position citing the declaration of Damon Brown, in which he avers that "the Facility does not have [areas of soil erosion], and thus they are not required to be listed on the [SWPPP site maps]." (Bond Decl. ISO Def. Mot. ¶ 30, Exs. P, Q, ECF No. 181.)

Plaintiff replies that it is unlikely that the Facility has no areas of soil erosion since "over half of the Facility is unpaved and covered with dirt," and asserts that Defendants "have historically had problems controlling their Total Suspended Solids ("TSS")" levels, which indicates that solids such as soil are present in the Facility's storm water discharges. Plaintiff supports its argument citing the Facility's 2009–2010 Annual Report, which indicates that water samples taken from two locations at the Facility showed 697 mg/L and 802 mg/L TSS respectively. (Packard

Decl. Ex. Q, CSM 004357, ECF No. 168–4.)

▮ It is uncontroverted that the Facility contains some pervious soil. (Pl.'s SUF ¶ 26.) Further, although Defendants' expert opines the Facility contains no areas of soil erosion, the Facility's 2009–2010 Annual Report TSS levels support drawing the reasonable inference that soil from the Facility is eroding into the Facility's water discharges since the TSS level measures solid particles suspended in the discharges. Therefore, each motion on this issue is denied.

### 3. Best Available Technology Economically Achievable ("BAT")/Best Conventional Pollution Control Technology ("BCT")

The parties cross move for summary judgment on Plaintiff's claim that Defendants violated General Permit Order B(3), which states in pertinent part "[f]acility operators covered by this General Permit must reduce or prevent pollutants associated with industrial activity in storm water discharges ... through implementation of *BAT* for toxic and non-conventional pollutants and *BCT* for conventional pollutants." (General Permit p. 4 (emphasis added).) The CWA discusses the assessment of BAT/BCT in 33 U.S.C. § 1314(b)(2)(B) as follows:

> Factors relating to the assessment of [BAT] ... shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.

"[T]he factors for assessing BCT are defined at 33 U.S.C. § 1314(b)(4)(B)· and are similar." *Cal. Sportfishing Prot. Alliance v. Cal. Ammonia Co.*, No. CIV S–05–0952 WBS JMF, 2007 WL 273847, at *7 (E.D.Cal. Jan. 29, 2007).

Plaintiff makes six arguments concerning Defendants' failure to implement BAT/BCT: (1) storm water discharge samples reveal chemical levels in excess of EPA benchmarks; (2) Defendants have not provided covered storage for the Facility's waste piles; (3) Defendants have not implemented modern sweeping technology; (4) Defendants failed to use appropriate filtration media; (5) Defendants failed to properly design and size the filtration units they do use; and (6) Defendants failed to implement BMPs to address dissolved metals.

#### a. Chemical Levels in Excess of EPA Benchmarks

▮ Plaintiff argues Defendants have not achieved BAT/BCT since the Facility's discharges reveal levels of chemicals in excess of the EPA benchmark levels, which is a per se violation of the General Permit. Plaintiff supports its position citing a compilation chart which shows the Facility's storm water discharge sample results exceed the EPA benchmark for aluminum iron, and zinc. (Gray Decl. Ex. G, ECF No. 177–1.)

Defendants respond that discharge levels in excess of the EPA benchmark levels are only circumstantial evidence that the Facility failed to implement BAT/BCT, and contend Plaintiff has not shown the referenced water samples were taken from the Facility. (Def.Mot. 27:24–25.) Defendants argue if the samples were taken from an outside source, the results may not represent the Facility's discharges, and therefore Plaintiff has not shown the Facility violated the General Permit.

Plaintiff has not presented evidence identifying the source of the referenced water samples. Therefore, each motion on this issue is denied.

### b. Covered Storage

Plaintiff argues Defendants have not implemented BAT/BCT at the Facility since "Defendants[ ] [have identified in] SWPPPs ... stockpiles of ... metals stored at the Facility as pollutant sources," but these stockpiles "ha[ve] [not been] covered ... to prevent storm water contact." Plaintiff contends that as a result, "storm water washes through and across the [metal] stockpiles, collecting finely divided toxic heavy metal particulates and sediment, before discharging from the Facility." (Pl. Mot.8:10–13.) Plaintiff supports its position citing Defendants' SWPPPs, which list areas of exposed scrap metal as a source of potential pollutants at the Facility, (Packard Decl. Ex. G CSM 000307; Ex. I CSM 000497, ECF Nos. 186–1, 186–2), and the undisputed facts establishing that some of the Facility's metal stockpiles are not covered. (Pl.'s SUF ¶ 29.)

Defendants respond that the Facility is adequately managing its metal stockpiles since water that washes across the stockpiles "encounter[s] [a] myriad [of tools] aimed at filtering sediment." (Def. Opp'n 31:2–3.) Defendants support their position citing Kim Scott's declaration, where she avers the Facility prevents pollutants from leaving the Facility when storm water is discharged through "daily sweeping, two bio-swales, sand filters, vegetated filters, straw wattles & blankets, absorbent socks, berms & grading to direct flow, gravel & baserock to filter storm water, tanks to capture the storm water before it discharges, and a filtering drain inlet box." (K. Scott Decl. ¶ 8, ECF No. 194.)

The uncontroverted facts establish that some of Defendants' metal stockpiles are uncovered; but it has not been shown that covering the stockpiles is necessary in light of how the stockpiles are managed. Therefore each motion is denied on this issue.

### c. Modern Sweeping Technology

Plaintiff argues the technology Defendants use to trap and capture pollutants before they are released in the Facility's storm water discharges has not achieved BAT/BCT, contending:

> Defendants use [1950's era] "drum" or "brush" sweepers on the Facility's impervious surfaces, [and] this ... technology ... has been surpassed by a new generation of "regenerative" sweepers that use a pulse of air to dislodge particulate matter together with vacuum hoses to capture and hold fine particulate.

(Pl.Mot. 8:20–23.) Plaintiff argues Defendants should have implemented this new technology since Plaintiff has documented, "a number of locations [where] ... distinctly visible piles and rows of fine particulate matter remained on the surface of the Facility" after sweeping. (Pl.Mot. 8:24–26.) Plaintiff cites the uncontroverted fact that Defendants use "drum" or "brush" sweepers, (Pl.'s SUF ¶ 33), and the rebuttal report of Plaintiff's expert geologist, Steven Bond, in which he opines "the Facility's sweeping procedures and the sweeping equipment are wholly inadequate to prevent metal particulates and other debris on the Facility from coming into contact with storm water and discharge[s] from the Facility." (Bond Decl. Ex. B, p 16, ECF No. 167–1.) Specifically Bond declares:

> On the ... September [18,] 2014 site inspection, portions of the Facility had recently been swept[,] ... [however] large portions of the concrete pad [were] ... left unswept and covered in layers of [debris such that] ... areas of dirt, finely divided metal particulate, and debris [were] exposed to rainfall and ... to

storm water runoff.... [Defendants' sweepers are] not effective at removing the fine particulate materials from within the cracks, joints, and fissures of the concrete pavement. Further, [they] obviously cannot sweep close to or within the piles or under bins, leaving large portions of the Facility processing areas unswept.

(Bond Decl. Ex. B. p. 16, ECF No. 167–1.)

 Defendants counter, citing the following quoted averments from Damon Brown's declaration: Defendants are not required to use the "regenerative sweepers" Plaintiff references since their current sweeping protocol "is effective," and "keeping the soil at the site for managed reuse [as they can with the drum and brush sweepers] is more beneficial to the environment than sending [the soil] into the waste stream" as would happen if the Facility used a regenerative sweeper. (Brown Decl. ¶ 33, ECF No. 181.) Defendants further rejoin that the Facility "engages in daily sweeping" and that Plaintiff's concerns regarding Bond's September 18, 2014 visit are "of no consequence" since that was "a dry, hot day and no rain was forecasted," and the Facility "engage[s] in much more careful and elaborate sweeping on days on which rain is forecasted." (Def. Opp'n 32:3–14.) Defendants also rely on the following averments from the Declaration of Jihan Gray, the Facility Manager, who avers that between 2007–2008, the Facility "implemented and/or engaged in ... daily sweeping near scrap metal piles." (Gray Decl. ¶ 3, ECF No. 177.) Defendants also cite the portion of Kim Scott's declaration, where she avers the Facility was swept "prior to [Plaintiff's September 18, 2014] inspection, [but the Facility] did not perform the very thorough sweeping inspection that it typically does prior to or on a day when rain is forecasted." (K. Scott Decl. ¶ 9, ECF No. 194.)

In light of the disputed factual issues each motion on this issue is denied.

#### d. Appropriate Filtration Media

Plaintiff argues the Facility currently uses sand in its water filtration system which is not as effective as other filtration media and that by choosing to use sand, Defendants fail to achieve BAT/BCT. (Pl. Mot. 9:2–5; 9:11–13.) Plaintiff supports its position by citing a report on which Defendants' expert environmental chemist, Barton Simmons, relies in reaching his conclusions, where it was found that filtration media such as compost, packing wood, enviro-media, ash, zeolite, and fine glass are capable of removing zinc from ground water at a 50–97% rate, whereas sand is capable of removing zinc from ground water at a 16% rate, and that those same materials removed copper from groundwater at a 39–97% rate, whereas sand removed copper from ground water at a 29% rate. (Packard Decl. Ex. ZZ CSM 026363.)

 Defendants respond that its sand filters are adequate, and cite the rebuttal report of Plaintiff's expert Steven Brown who states: "Having observed the sand filters at the Facility and having [the] benefit of the observations made at the site during recent 2014 storm events, the design appears sound for its current purpose." (Brown Decl. Ex. P p. 8, ECF No. 181–17.)

In light of the factual disputes concerning this issue, each motion is denied.

#### e. Properly Designed and Sized Filtration Units

Plaintiff argues even if Defendants' water filtration units used a filtration media other than sand, the units would still fail to achieve BAT/BCT since "the filtration units themselves are so poorly designed and undersized for the volumes of storm water generated at the Facility that storm

water [overflows and] bypasses [the water filtration system] without treatment under common, normal rainfall conditions." (Pl. Mot. 9:14–17.) Plaintiff supports its position citing Steven Bond's opening report, which states that the Facility's water filtration units have "an inappropriate design and do[ ] not function as a filter under common, normal rainfall conditions." (Bond. Decl. Ex. A p. 16–17, 38 ECF No. 167–1.)

Defendants respond that the Facility's "sand filters are more than adequate to meet the BAT/BCT standards," (Def. Opp'n 32:24), and support their position citing Damon Brown's following deposition testimony: the sand filters are "working well when you look at the monitoring data." (Cannata Opp'n Decl. Ex. C 265:1–267:13, 195–1.)

In light of the factual disputes concerning the effectiveness of the Facility's water filtration units, each motion on this issue is denied.

### f. Dissolved Metals

Plaintiff argues the Facility has not achieved BAT/BCT concerning dissolved metals since water sample results "show ... [dissolved] copper, lead, zinc, nickel, chromium and molybendum are discharged" from the Facility, and Defendants "have ... failed to develop and implement BMPs to address discharges of any dissolved metals, which, by definition, are not [mitigated] by filtration." (Pl. Mot. 10:23; 11:1–3; 11:4–7.) Plaintiff cites two water samples taken from the Facility on December 6, 2007, and relies on Steven Bond's analysis of those samples, where he opines copper, lead, zinc, nickel, chromium and molybdenum are discharged from the Facility in their dissolved form, and concludes "[t]here are no BMPs at the Facility that address the issue of dissolved or dissociated pollutants." (Packard Decl. Ex. W CSM000729–754, ECF No. 168–5; Bond Decl. Ex. A, App'x B Table 2, ECF

No. 167–1; Bond Decl. Ex. A p. 9, ECF No. 167–1.)

Defendants counter that the Facility's BMPs address dissolved metals and support their position citing Damon Brown's declaration, where he avers Bond's assessments of the Facility's BMPs are "incorrect" since research has shown the traditional sand filters the Facility uses "have excellent heavy metal removal properties" and have been "effective for the treatment of dissolved metal contaminants commonly found in storm water." (Brown Decl. ISO Def. Mot. Ex. P, p. 8, ECF No. 181–17.) Defendants also rely on a portion of Barton Simmons' declaration where he avers that Bond's methodology was faulty since he relied on two samples, which is an insufficiently small sample size, and the samples he analyzed presented "non-detect" chemical levels, which should not have been used. (Simmons Decl. Opp'n Pl. Mot., ¶ 11, ECF No. 190.)

In light of the factual disputes concerning the Facility's BMPs addressing dissolved metals, each motion on this issue is denied.

### 4. Monitoring and Reporting Program ("MRP")

Plaintiff and Defendants cross move for summary judgment on Plaintiff's claim alleging Defendants failed to comply with Section B of the General Permit, which requires Defendants to develop and implement a Monitoring and Reporting Program ("MRP") for the Facility.

As part of [a] MRP, a permittee must conduct visual observations of storm water throughout the Wet Season; must collect water samples at each outfall during specific times; must analyze these samples for specific contaminants; and must file Annual Reports with the [Water] Board summarizing the visual

observation, results of sampling analysis, and General Permit compliance.

*Santa Monica Baykeeper v. Int'l Metals Ekco, Ltd.,* 619 F.Supp.2d 936, 942 (C.D.Cal.2009). Plaintiff alleges Defendants' MRP was inadequate since Defendants (1) failed to sample for all required pollutants, (2) failed to consistently sample at each of the Facility's discharge points, and (3) failed to take the required number of samples during the 2012–2013 wet season.

#### a. Sampling Required Pollutant Parameters

Each party seeks summary judgment on Plaintiff's claim alleging Defendants violated Section B of the General Permit by failing to test the Facility's water samples for polychlorinated biphenyl ("PCBs"). Defendants further seek summary adjudication on Plaintiff's claim that Defendants violated Section B by failing to test the Facility's water samples for nickel, cadmium, chromium, antimony, arsenic, mercury, molybdenum, and selenium.

Section B(5) of the General Permit requires that storm water samples be analyzed for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." (General Permit p. 27.) The General Permit defines "significant quantities" as follows: "the volume, concentration, or mass of pollutant that can cause or threaten to cause pollution, contamination, or nuisance; or adversely impact human health or the environment; and/or cause or contribute to a violation of any applicable water quality standards for the receiving water." (General Permit Attachment 4.)

#### i. PCBs

Plaintiff argues Defendants were required to analyze their water samples for PCBs since surface soil samples at the Facility reveal the presence of PCBs and Defendants' expert Barton Simmons acknowledges PCBs are "ubiquitous" in the scrap metal industry, yet Defendants have not required PCB testing of their storm water samples. (Pl. Mot. 11:9–21; Pl. RJN Ex. H, CSM 002179, ECF No. 166–3.)

Defendants respond "PCBs are virtually insoluble," and so "[t]he probability of the Facility's storm water containing PCBs above the benchmark level is extremely low." (Def. Opp'n 45:11–22.) Defendants cite in support of their position Simmons' Declaration where he avers:

> [w]hether or not PCBs are present in the soil at [the Facility] is somewhat irrelevant to the present case [because] .... [t]here is not only no evidence that PCBs in storm water have left [the Facility], but also no reason to expect PCBs in storm water. PCBs are virtually insoluble; .... [therefore], [t]he probability of the Facility's storm water containing PCBs above a benchmark is extremely low.

(Simmons Decl. ¶ 6, ECF No. 190.)

Plaintiff disagrees, citing the portion of Steven Bond's declaration where he avers that Simmons' opinion is "not credible" for the following reasons:

> [T]he solubility of PCBs is not a precondition for transport in storm water or any surface water flows. Storm water transports solid and dissolved chemical components alike. Regardless of the solubility of a contaminant, it is subject to transport in solid particulate form. Eroded sediment is transported in storm water mainly as a mass of suspended soil particulates referred to as total suspended solids (TSS). Storm water samples, unless otherwise specified, are analyzed for the total concentrations of contaminants which include total, dissolved, and dissociated chemicals.

(Bond Decl. IS Pl. Reply ISO Pl. MSJ ¶ 6, ECF No. 211.)

■ In light of the disputed factual issues concerning whether PCBs are likely to end up in the Facility's storm water and Section B(5)'s requirement that the Facility need only analyze water samples for "pollutants that are likely to be present in storm water discharges in significant quantities," each motion on this issue is denied.

### ii. Remaining Chemicals

Defendants seek summary judgment on Plaintiff's claim alleging they violated Section B(5) by failing to test the Facility's water samples for nickel, cadmium, chromium, antimony, arsenic, mercury, molybdenum, and selenium, arguing that significant quantities of these chemicals were not present in the water samples. Defendants support their position citing Barton Simmons' rebuttal report where Simmons states that based on the Water Board's December 2007 sampling, the concentration of nickel, cadmium, chromium, antimony, arsenic, mercury, and selenium were all below the background or benchmark levels, and therefore testing was not required, (Simmons Decl. Ex. B, PLF013760, ECF No. 178-2); and that the Facility's 2010 sampling, which shows the levels of nickel, cadmium and chromium, were below background or benchmark levels. (Simmons Decl. ¶ 7, ECF No. 178.) Defendants also argue they were not required to test for the referenced pollutants since Section B(5)(c)(iii) of the General Permit lists circumstances under which a facility need not sample for pollution parameters *listed in Table D*; however, this argument has not been shown relevant since Plaintiff's claim does not reference pollutants listed in Table D of the General Permit. (General Permit p. 43.)

Plaintiff responds there is a genuine material factual issue concerning whether Defendants should have analyzed the water samples for the referenced chemicals, arguing the chemicals are likely to be present in the Facility's storm water in significant quantities, citing Steven Bond's expert report, where he states that the referenced chemicals have all been found at the Facility by the government and opines:

> Based on the nature of the operations at the Facility, the types of materials handled and stored at the Facility, and the general lack of structural controls and less than ideal housekeeping practices, the above-referenced [chemicals] are likely to be present in CMS's storm water discharges in significant quantities.

(Bond Dec. ISO Pl. Mot. Ex. A, p. 35–36, ECF No. 167-1.)

In light of the factual dispute concerning whether significant quantities of the referenced chemicals are likely present in the Facility's storm water, each motion on this issue is denied.

### b. Consistent Sampling

Plaintiff alleges Defendants violated Section B(7) of the General Permit by failing to consistently sample all discharge points at the Facility; specifically Plaintiff alleges Defendants failed to sample: (1) discharge point SWSL1 in 20092010; (2) discharge point SWSL1 in 2010–2011; (3) the discharge point at the West Gate in any year; and (4) the discharge point at the southwestern corner at the western end of the southern Property boundary in any year.

Section B(7)(a) of the General Permit states "facility operators shall ... collect samples of storm water discharges from all drainage areas that represent the quality and quantity of the facility's storm water discharges." (General Permit. P. 28.) However, Section B(7)(d) states:

[f]acility operators who determine that the industrial activities and [Best Management Practices] within two or more drainage areas are substantially identical may ... collect samples from a reduced number of substantially identical drainage areas.... Facility operators must document such a determination in the annual report.

(General Permit p. 28.)

### i. 2009–2010 Wet Season

Plaintiff argues Defendants failed to sample the discharge area identified as SWSL1 during the 2009–2010 season, and cites the Facility's 2009–2010 Annual Report, which identifies two discharge locations, SWSL1 and SWSL2. (Pl.'s SUF ¶ 75.)

Defendants respond they were not required to sample SWSL1 since under Section B(7)(a), SWSL1 is substantially identical to SWSL2, which was sampled. The Facility's 2009–2010 Annual Report states discharges from SWSL2 are representative of the discharges from SWSL1:

The [West Gate] storm water sample location ... is located immediately north of the entrance. The [South West Corner] storm water sample location ... is located down stream of the West Gate location on the south west frontage of the facility. The flows from the West Gate join the flow at the south frontage of the property at the South West Corner sample location; *therefore it was determined that one sample location is representative of both flows* and only one sample location (down gradient location) was sample[d] as allowed in Section B7d of the General Permit.

(Pl.'s SUF ¶ 76; Packard Decl. Ex. Q CSM 4357, ECF No. 168–4) (emphasis added.)

■ Section B(7)(a) of the General Permit states that in order to rely on the storm water samples from SWSL2 as representative of SWSL1, the facility operator must determine "the industrial activities and BMPs" within both areas are "substantially identical." (General Permit p. 28.) However, neither party sufficiently addresses this requirement, and therefore each motion on this issue is denied.

### ii. 2010–2011 Wet Season

Plaintiff argues Defendants were required to sample storm water discharges from SWSL1 during 2010–2011; however, the uncontroverted facts show the 2010–2011 Annual Report does not list SWSL1 as a discharge location. (Pl.'s SUF ¶ 80.)

Defendants respond that they were not required to sample storm water discharges from SWSL1 in 2010–2011 since the SWSL1 discharge point was eliminated. (Def. Opp'n 42:7–8.) Defendants support their position citing the portion of Kim Scott's declaration where she avers that at the end of the 2009–2010 storm season, the Facility determined that much of the discharge from SWSL1 was being caused by a neighboring facility, and after she spoke with the neighboring facility, it was determined that "(1) the discharge from SWSL1 was no longer likely due to the improvements [that the neighboring facility stated it would make] and (2) any discharge from SWSL2 would be representative of the industrial activities on the entire Facility," and therefore the Facility "eliminated SWSL1 as a discharge point." (K. Scott Decl. Opp'n Pl. Mot. ¶¶ 17–18, ECF No. 194.)

Plaintiff replies that Defendants' 2010–2011 Annual Report reveals the Facility did not consider SWSL2 to be representative of SWSL1 since the report "affirmatively directs Defendants to indicate whether they are claiming the B(7)(d) exemption[,] ... and Defendants failed to respond [in the Annual Report] that they were" claiming the exemption. (Pl. Reply 22:15–18.)

■ Kim Scott's declaration shows the Facility did not report samples from SWSL1 in the 2010–2011 Annual Report because she considered SWSL2 to be representative of the entire Facility. However, the 2010–2011 Annual Report prescribed that if Defendants chose not to report storm water sampling from SWSL1 because they opined SWSL2 was representative, they needed to disclose that information in their 2010–2011 Annual report. Defendants did not do so. Therefore, Plaintiff's motion on this issue is granted, and Defendants' motion is denied.

### iii. West Gate

Plaintiff argues Defendants violated Section B of the General Permit by failing "to identify, sample and monitor" discharges from the West Gate of the Facility. (Pl. Mot. 13:8–9.) The uncontroverted facts establish the Facility's Annual Reports have never reported storm water samples taken from the West Gate. (Pl.'s SUF ¶ 97.) Plaintiff supports its argument that there were storm water discharges at the West Gate by citing Steven Bond's averments that "[i]t seemed reasonable to assume that, under high flow conditions [meaning intense rainstorms] ... there would be flow out of the [West Gate]," (Packard Decl. Ex. EEE 48:19–25, ECF No. 168–12), and photographs Bond took on December 11, 2014 showing discharge at the West Gate. (Bond Decl. ¶ 10, Ex. I, CSM19396, CSM19405, CSM19408, ECF No. 167–2.) Plaintiff also relies on samples requested by the Water Board showing there were water discharges from the Facility's West Gate in December 2007. (Packard Decl. Ex. W, CSM 000730, ECF No. 168–5.)

Defendants respond they were not required to sample at West Gate since the Facility installed a berm, "which has prevented discharges in that area[,]" and even if storm water did discharge, sampling at the West Gate "would be redundant [of sampling at SWSL2]." (Def.Mot.30:3–13.) Defendants also cite a portion of Jihan Gray's declaration, where she avers "[s]torm water sometimes discharged from the Facility at [the West Gate, but] ... [s]ampling at the 'West Gate' would be redundant because it is home to ... many of the same BMPs as SWSL1 and SWSL2," and also that she "installed a berm at the 'West Gate area [in November 2014] which has completely prevented discharges.'" (Gray Decl. ¶ 12, ECF No. 177.)

■ Gray's averments evince that water has discharged from the West Gate, and therefore Section B(7) of the General Permit requires Defendants to sample storm water from that location unless the facility operator determines "the industrial activities and BMPs" at the West Gate are substantially identical to another location and "such a determination [is documented] in the annual report." (General Permit p. 28.) The uncontroverted facts establish that Defendants' Annual Report does not list the West Gate as a discharge point, (Pl.'s SUF ¶ 97); nor does the report state that the West Gate was substantially identical to another discharge point. Therefore, Plaintiff's motion on this issue is granted and Defendants' motion is denied.

### iv. Southern Boundary

Plaintiff argues Defendants "failed to identify, sample and monitor" the *southwest corner at the western end of the southern property boundary,*" (Pl.Mot. 13:7–1), and supports its argument citing Steven Bond's deposition testimony, where he avers that on December 12, 2014, he observed, "discharges ... from several areas in the southwest corner" beyond SWSL2." (Packard Decl. Ex. JJ, 134:1–23, ECF No. 168–7.) Further, the uncontroverted facts establish the Facility's Annual Report never reported storm water

samples taken at this location. (Pl.'s SUF ¶ 97.)

Defendants respond that the General Permit did not require them to sample the "alleged southwestern discharge point" since the only evidence of discharge from this location was a "one-time occurrence" during "one of the largest storm events in recent memory," as a result of which the Facility's "outfall pipe at SWSL2 was overwhelmed and compromised," and "storm water began flowing out through the pipe as well as around the pipe." Defendants also rejoin that the Facility "made interim repairs to the SWSL2 pipe[,] and the area has been secure in subsequent storm events." (Def. Opp'n 43:10–20.) Defendants cite the following portion of Kim Scott's declaration concerning the matter:

> due to the nature, size and intensity [of the December 11, 2014 storm event, the Facility's] outfall pipe at SWSL2 was overwhelmed and compromised. As a result, storm water began flowing out through the pipe as well as around the pipe. [The Facility] immediately made interim repairs to that location and the area has been secure in subsequent storm events.

(K. Scott. Decl. ¶ 20, ECF No. 194.) Defendants also cite Scott's declaration where she avers "any discharge from SWSL2 would be representative of the industrial activities on the entire Facility," and therefore the Facility was not required to report any storm water discharges from the southwest corner. (K. Scott Decl. ¶ 17, ECF No. 194.)

Plaintiff replies "Defendants have never claimed reduced sampling in relation to the southern boundary discharge point as required to claim the exemption under Section B(7)(d)." (Pl. Reply 24:1–3.)

Kim Scott's averments evince that storm water discharged from the southwest corner at the western end of the southern property boundary. (K. Scott. Decl. ¶ 20,

ECF No. 194.) The General Permit required the Facility to sample water from the southwest corner at the western end of the southern property boundary unless, *inter alia*, the facility operator "documented [his or her] . . . determination [in the annual report that the discharge point was substantially identical to another discharge point,]" which Defendants did not do. (General Permit p. 28.) Therefore, Plaintiff's motion on this issue is granted and Defendants' motion is denied.

### c. Failure to Take Samples

Plaintiff argues Defendants violated Section 5 of the General Permit by failing to take two storm water discharge samples during the 2012–2013 wet season. Concerning this matter, Section B(5)(a–b) of the General Permit states:

> Facility operators shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled. . . . Sample collection is only required of storm water discharges that occur during scheduled facility operating hours and that are preceded by at least (3) three working days without storm water discharges.

(Pl. RJN Ex. A General Permit p. 26–27.) Plaintiff argues "[f]or the 2012–2013 wet season, Defendants did not report any storm water samples to the Regional Board and certified under oath that . . . '[t]here was no qualifying event,' . . . [h]owever, . . . it is undisputed that storm water discharged from the Facility on at least three [occasions] during the 2012–2013 wet season." (Pl.Mot. 13:20–14:1.) Plaintiff contends discharges occurred November 17, 2012; December 21, 2012; and March 20, 2013.

### i. November 17, 2012

Plaintiff cites in support of its position that a discharge occurred on November 17, 2012, the Lane Report, where Lane provides the results from a sampling event conducted on November 17, 2012. (Lane Decl. Ex. I. PLF014630, ECF No. 170–3.)

Defendants respond "there were no discharges" in November 2012, and that the November 17, 2012 samples were taken by a third-party and Plaintiff cannot demonstrate "what occurred on that date, where the samples were taken, or when they were taken." (Def. Opp'n 35:3–6; 35:14.) Defendants cite a portion of Kim Scott's declaration where she avers "[o]n November 17, 2012 there was not enough rain at the Facility to generate a discharge." (K. Scott Decl. ¶¶ 11, ECF No. 194.)

 In light of the conflicting evidence on the issue of whether there was a discharge at the Facility on November 17, 2012, each motion concerning this date is denied.

### ii. December 21, 2012

Plaintiff cites in support of its position that a discharge occurred from the Facility on December 21, 2012, the Lane Report in which Lane "presents the analytical results for ... the sampling event conducted on December 21, 2012." (Lane Decl. Ex. J, PLF014664, ECF No. 170–4.)

Defendants respond that they "do[ ] not believe" there was a discharge from the Facility on December 21, 2012, citing to a portion of Jihan Gray's Declaration, and arguing that "[t]hough Ms. Gray does not recall December 21, 2012 with certainty, she knows and attests to her custom and practice that she *tries* to complete a Wet Weather Visual Observation Form whenever it rains/discharges," and since there is no form for December 21, 2012, this is evidence that there was no discharge from the Facility that day. (Def. Opp'n 36:18–

28; Gray Decl. ¶ 4, ECF No. 193) (emphasis added.)

 Plaintiff replies that evidence of Gray's habit is insufficient to create a genuine dispute of fact since Lane analyzed samples from that date.

Gray's averment that she *"tries* to complete a Wet Weather Visual Observation Form whenever it rains/discharges" is insufficient to controvert Plaintiff's direct evidence concerning the discharge on December 21, 2012. *See* Fed.R.Evid. 406 Advisory Committee's Note (2011) (stating the "adequacy of sampling and uniformity of response are key factors" in determining whether a particular behavior is a habit); *see also S.E.C. v. Dunn,* No. 2:09–CV–2213 JCM (VCF), 2012 WL 475653, at *5 (D.Nev. Feb. 14, 2012) ("This court finds that, as contemplated in the Federal Rules of Evidence, the term 'habit' requires more consistency of action than has been shown here."). Therefore Plaintiff's motion concerning this date is granted and Defendants' motion is denied.

### iii. March 20, 2013

Plaintiff cites in support of its position that Defendants failed to report a storm water discharge on March 20, 2013, a report showing storm water samples analyzed by KIFF Analytical LLC, which states the sample date is "03/20/2013." (Packard Decl. Ex. Z, CSM003763, ECF No. 168–5.)

 Defendants respond that they were not required to file a report for March 20, 2013, since the discharge occurred prior to the start of business hours, citing Section 5(b)(8) of the General Permit, which states in part that when a discharge begins more than one hour before a facility begins its operations, the facility operator *"may* ... sample collection more than one hour after discharge begins if the facility operator determines that the objec-

37

tives of the Section will be better satisfied." (General Permit p. 29 (emphasis added).) Defendants cite in support of their position that the rain event on March 20, 2013 began prior to business hours the Wet Weather Visual Observation Form filled out by Jihan Gray, which states "rain heavy through night[,] sample had been discharging for several hours before 8:00 A.M." (Gray Decl. Ex. D, CSM 4268, ECF No. 193–1.)

Plaintiff offers no evidence from which a reasonable inference could be drawn that the wet weather event on March 20, 2013 began less than one hour before the Facility opened. Therefore, Plaintiff's motion concerning this date is denied and Defendants' motion is granted.

### E. California Law

Plaintiff's Cal. Health & Safety Code section 25249 claim alleges Defendants knowingly discharged lead into sources of drinking water. Plaintiff alleges Defendants violated section 25249 on forty-two occasions by discharging water with lead concentrations above the CTR standard. Defendants seek summary judgment on each of the forty-two discharges; however, Plaintiff only seeks summary judgment on eighteen discharges and argues the remaining twenty-four discharges present a genuine issue of material fact precluding summary judgment.

Cal. Health & Safety Code section 25249 states in pertinent part, "[n]o person ... shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or into land where such chemical passes or probably will pass into any source of drinking water." "Lead has been identified as a known carcinogen and reproductive toxin." *Evnt'l. Law Found. v. Beech-Nut Nutrition Corp.*, 235 Cal.App.4th 307, 312, 185 Cal.Rptr.3d 189 (2015). However, a "safe harbor exemption" in Cal. Health & Safety Code section 25249.9(b) states: "section 25249 shall not apply to any discharge or release [if the defendant can show, *inter alia*, that] "the discharge or release is in conformity with all other laws and with every applicable regulation, permit, requirement, and order." "

Plaintiff argues it is uncontroverted that on twelve dates between 2008 and 2012, samples of storm water from the Facility revealed concentrations of lead in excess of the CTR standards. (Pl.'s SUF ¶¶ 218–227, 232, 235–237, 250–257.)

Defendants rejoin there is no evidence the Facility *discharged or released lead into sources of drinking water* since the origin of the lead concentrations in the samples is unclear and therefore Plaintiff has not shown lead was "discharged or released" from the Facility. Defendants argue they have not "discharged or released" lead as the phrase is used in section 25249, and cite *Consumer Advocacy Grp., Inc. v. Exxon Mobil Corp.* ("*CAG*"), 104 Cal.App.4th 438, 128 Cal.Rptr.2d 454 (2002), in support of their argument. The *CAG* court held that the words "discharge" and "release" "convey movement out of a confined space such as a container, not, ... simply movement from one point to another," stating:

> "discharge or release" as used in section 25249 refers to a movement of chemicals from a confined space into the land or the water. The subsequent passive migration of chemicals through the soil or water after having been so discharged or released by a party does not constitute another discharge or release within the meaning of section 25249.

*Id.* at 444, 450, 128 Cal.Rptr.2d 454.

Plaintiff has not presented evidence that the Facility was the source of the lead detected in the referenced water samples. Therefore its motion on this issue is denied.

Defendant argues even if the source of the detected levels of lead is uncertain, its motion on all forty-two samples should be granted for four reasons: (1) the "safe harbor exemption," applies, (2) Plaintiff's TAC is insufficiently vague, (3) there is insufficient evidence that any discharge was made "knowingly[,]" and (4) there is insufficient evidence any discharge was made "into a source of drinking water."

### 1. Safe Harbor

Defendants argue they are protected by the "safe harbor exemption" since *inter alia*, the "discharges or releases" from the Facility are "in conformity with . . . every applicable regulation, permit, requirement, and order." Cal. Health & Safety Code § 25249.9(b). Plaintiff responds that Defendants have violated the terms of the General Permit, and therefore the safe harbor exemption does not apply.

 Plaintiff presented sufficient evidence to demonstrate that some of the Facility's storm water discharges violated Section C of the General Permit by "caus[ing] or contribut[ing] to an exceedance of . . . [the] applicable water quality standards" for lead in the CTR. (General Permit. P. 4) Therefore, Defendants' summary judgment motion based on the safe harbor exemption is denied.

### 2. Vagueness

Defendants argue the allegations in Plaintiff's TAC concerning Plaintiff's section 25249 claim are so vague that the basis of Plaintiff's claim cannot be determined. (Def.Mot. 32:27–28:1.) Plaintiff responds that the TAC and Exhibit D attached to the TAC demonstrate its section 25249 claim is not vague. Concerning this claim, Plaintiff alleges "[t]his action . . . seeks to remedy Defendant[s'] . . . continuing discharge or releases of lead and lead compounds into sources of drinking water in violation of California Health & Safety Code Section 25249.5 (also referred

to as 'Proposition 65')." (TAC ¶¶ 4–5.) Exhibit D, which is attached to the TAC, is a "Notice of Proposition 65 Violations" that Plaintiff sent Defendants, it states: the asserted "violations [of section 25249] involve the discharge of lead and lead compounds into sources of drinking water." (TAC Ex. D.) In light of the referenced allegations in the TAC, Defendants have not shown this claim is impermissibly vague.

### 3. "Knowingly"

 Defendants argue Plaintiff cannot show any discharge or release of lead from the Facility was done "knowingly." Plaintiff responds that Defendants "have known that the Facility discharges lead since at least the date" when Defendants received lab reports from a November 1, 2008 sampling event revealing lead in the storm water. (Packard Decl. ISO Pl. Mot. Ex. O, CSM 000660, ECF No. 168–3.) The water sample results Plaintiff references were published in Defendants' 2008–2009 Annual Report and create a genuine issue of material fact concerning whether Defendants had knowledge that the discharges or releases from its Facility contained lead. Therefore Defendants' motion based on this argument is denied.

### 4. "Into a Source of Drinking Water"

 Defendants argue Plaintiff cannot show any discharge or release of lead from the Facility "passes or probably will pass into a source of drinking water" as required to prove its section 25249 claim. Plaintiff responds that the Facility's discharges probably will pass into the Wyman Ravine, which is a designated source of drinking water. Plaintiff supports its position by citing to John Lane's report where he states that on April 4, 2012, he personally "observed continuous storm water flow from the Facility . . . into Wyman Ravine." (Lane Decl. Ex. A p. 4, ECF No. 170–1.)

Plaintiff also cites the uncontroverted fact that the Wyman Ravine is a tributary of the Feather River, (Pl SUF ¶ 265), and the text of the Basin Plan, which states the Feather River is an existing source of drinking water, and "[t]he beneficial uses of any ... body of water generally apply to its tributary streams." (Pl. RJN Ex. B Basin Plan ("Basin Plan") II.2.00; II.4.00–II–6.00, ECF No. 166–1).

In light of Plaintiff's evidence, Defendants' motion on this issue is denied.

## IV. CONCLUSION

For the stated reasons, Plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.